## FERRIS v. COOVER—FERRIS v. CHAPMAN et al.

On the 18th of June, 1841, Juan B. Alvarado, then Governor of California, issued a grant of a tract of land designated as New Helvetia, comprising eleven square leagues within certain specified boundaries, to John A. Sutter, for himself and colonists, subject to the approval or disapproval of the Supreme Government and the Departmental Junta, and upon certain conditions : *Held, first,* that the grant was a conveyance of the land in full property, subject to be defeated by the subsequent action of the Supreme Government and Departmental Assembly ; *second,* that the clauses in the grant against the obstruction of the highways and the navigation of the streams, were reservations in favor of the public; *third,* that the condition as to maintenance of the Indians of the different tribes in their possessions, and the conditions of cultivation and occupancy of the land with families, attached to the grant by force of the regulations of November 21st, 1828, were conditions subsequent which did not prevent the estate from becoming vested *eo instante* with the delivery of the grant, and for a non-compliance with which the estate could only be divested by the action of the government; and, *fourth,* that the approval of the Supreme Government and Departmental Assembly was not a condition precedent to the vesting of the title.

The authority to make grants of land was lodged solely in the Governor. It was not shared by him with the Departmental Assembly. That body possessed no power to make any grant. Its power was restricted to approval or disapproval of the grant made. After its action, whether of approval or disapproval, it became the duty of the Governor to forward *the necessary documents, with the report of the Territorial Deputation,* to the Supreme Government. Until the approval of the Supreme Government, the grant was subject to be defeated. With such approval, it was discharged of the defeasance, and became *definitively,* that is, *finally,* valid.

It was the duty of the Governor, and not of the grantee, to submit the grant to the Departmental Assembly, and afterwards, with its report, to the Supreme Government. The neglect or refusal of the Governor to make such submission, could not impair the estate of the grantee in the land. It only operated as a suspension of the definitive validity of the grant. Once exercised, the power of the Governor over the land granted ceased. He could not recall or revoke the grant; nor, by any action or neglect, divest the estate granted.

The title to the land passed to Sutter by his grant; an estate vested in him, subject to be defeated by the action of the Mexican Government by direct rejection, or, in case of non-compliance with its conditions, by proceedings to that end. But, until one or the other of these proceedings had taken place, the title continued in Sutter unimpaired. Neither of these proceedings were had under the Mexican Government, and, at the date of the cession of California to the United States, his title remained in full force.

The title to Sutter was in no respect impaired by the treaty of cession. By the law of nations, independent of treaty stipulations, the inhabitants of a ceded territory retain all rights of property ; and, by the stipulations of the treaty of Guadalupe Hidalgo, those citizens of the Mexican Republic, in the territories ceded, who elected to become citizens of the United States, are protected in the enjoyment of their property.

*Quære.*—Whether any right of defeasance or forfeiture, which may have existed in the Mexican Government, in respect to the grant to Sutter, ever passed to the United States, and whether the grant did not, by operation of the treaty of cession, become discharged of all conditions.

Under the former government, Sutter was entitled to the possession of the land under his grant. To avoid a denouncement and a possible forfeiture of his estate, he was required to occupy and cultivate the land, and its possession was his right, which could have been enforced. It was a right to the use and enjoyment of property, and as such was guarantied by the stipulations of the treaty. It accompanied his grant, and, like any other right of property, may be enforced in our Courts. The action of ejectment will lie directly upon the grant to recover the land, or any portion thereof, embraced within its boundaries.

Leese and Vallejo v. Clark, and Vanderslice v. Hanks, (reported in 3 Cal. Rep., 17, 47,) are overruled.

If the grant to Sutter contains more than eleven leagues of land, until the surplus is

Ferris *v.* Coover.

legally determined by a survey and measurement by the officers of the government, no individual can complain. The government alone can determine and set apart the surplus; and, until its action in the matter, the right of the grantee remains good to the possession of the entire tract within the designated boundaries.

Whether the premises in controversy in this suit, are included within the grant, is a question of fact, to be submitted to the jury.

Where there is a conflict between the boundaries of a grant of land, as designated in the grant by parallels of latitude, and as designated by a map referred to in the grant, parol evidence is admissible in explanation of the boundaries, and to fix the location of the land granted.

A map, referred to in a grant for the purpose of identifying the land, is to be regarded as a part of the grant itself, as much so as if incorporated into it.

If, taking the grant and map together, any portion of the description must be rejected, reference will be had to the circumstances under which the grant was made, and the intentions of the parties, and parol evidence is admissible in such case for that purpose. That portion will be rejected, and that construction adopted, which will give effect to the intentions of the parties.

The rules adopted in the construction of boundaries are those which will best enable the Courts to ascertain the intention of the parties. Preference is given to monuments, because they are least liable to mistakes; and the degree of importance given to natural or artificial monuments, courses, and distances, is just in proportion to the liability of parties to err in reference to them. But they do not occupy an inflexible position in regard to each other. It may sometimes happen, in case of a clear mistake, that an inferior means of location will control a higher.

An instruction to the jury that they must take the grant and map together, and if they believe the land in controversy within the grant, as explained by the map, they will find for the plaintiff, held to be correct.

The doctrine of abandonment only applies where there has been a mere naked possession without title. Where there is a title, to preserve it there need be no continuance of possession; and the abandonment of possession can not affect the rights held by virtue of the title.

The fact that the plaintiff in ejectment stood by and saw the defendant erect improvements on the land, can not be plead as an estoppel by a trespasser, where the fact of title is open and notorious, or can be easily ascertained as by reference to the recorder's office.

Silence in such case, by the owner of the property, can not be plead as an estoppel by one acquainted with his own rights, or who has the means of ascertaining them.

By the doctrine of the common law, a party claiming under a tax-deed must show that all the requirements of the law, from the first to the last, have been complied with. Though the statute has altered the rule, and made the deed *prima facie* evidence of the conveyance of all the title of the delinquent, it does not dispense with the necessity of the officer reciting in the deed the authority under which he acted. The deed has no validity as an independent conveyance. It depends upon the statute, and if, by any of its recitals, it appears that any material requisition of the law has been omitted, the deed is void.

The listing and valuation of real estate, for the purpose of taxation, is an essential prerequisite to the validity of all subsequent proceedings. The assessment must be made by the assessor.

If no valuation was placed by the assessor upon the property, none can be placed upon it by the board of equalization. The board may alter the valuation, in order to equalize it, but can not place the valuation in the first instance.

The employment of new counsel, after decision rendered, is no ground for an extension of the time prescribed by the rules of the Court for filing a petition for a re-hearing.

APPEAL from the District Court of the Sixth Judicial District, County of Sacramento.

These were actions of ejectment, to recover the possession of two lots, situated in the city of Sacramento. By the agreement of parties, they were tried together in the Court below.

On the trial, John A. Sutter was examined as a witness, and

Ferris v. Coover.

he testified that he arrived in that part of California where the city of Sacramento is situated, in August, 1839; that he received, in June, 1841, from the then Governor of California, Juan B. Alvarado, a grant of eleven leagues of land; that the grant was accompanied with a map; that the map and grant were both delivered by him to John S. Fowler, in 1850; the map produced and subsequently offered in evidence, (and of which the one given in this statement of the case is substantially a correct copy,) was a true copy of the original map accompanying the grant, so far as he could recollect; that previous to applying for the grant, he had a survey of the land made by Capt. Vioget; that the southern boundary of that survey was below Sutterville, (a place some miles south of the American River;) that he was living, at the time of the survey, at the Fort; that he had stock, and cattle, and from fifteen to twenty men with him; that between the issuing of the grant and the year 1848 he had 1500 head of cattle, 2400 head of horses, a flock of sheep, the buildings where the Fort stands, improvements on the American River, an establishment at Sutterville, a blacksmith's shop, carpenter's shop, shoemaker's shop, a tannery, distillery, and saddler's shop; that he took possession of the land with the permission of the Mexican government, and afterwards held the land under his grant.

John S. Fowler, who was examined as a witness, testified that the original grant and map were destroyed by fire in October, 1851; that he had possession of them at the time of their destruction; that the grant had been copied in the book of records of Sacramento county; that the record was written by one Clough; that the witness and Clough compared together, the day following the recording, the original grant with the record, and found the record correct; that the map and grant were connected together with a seal.

The plaintiff then offered in evidence the record of the grant, to the introduction of which the defendant objected on several grounds, but on the appeal relied upon the following : *first*, that the grant was imperfect, inchoate, and incomplete; and, *second*, that the grant does not include the land in controversy; but the Court overruled the objection, and allowed the record of the grant to be read, the original being destroyed, and the defendant excepted.

The petition upon which the grant was issued was also read in evidence.

The deposition of John J. Vioget was had in the case. He testified that he was a practical surveyor, and surveyed a tract of land for John A. Sutter, in or about the year 1841; that the said tract commences on the Sacramento River, at the southern part of a laguna or pond, about three or four miles south of the American River; and runs thence east along the shore of the laguna; that he made the survey with a compass, chain, and

sextant; that Captain Sutter ordered him to make the southern line of the survey south of the above-mentioned laguna; that he made for Sutter two plats, or maps, one of which Sutter filed at Monterey with his petition to the government for a grant, and the other Sutter kept; that the one Sutter kept was a correct copy of the one filed at Monterey.; that the survey made by the witness was preparatory to the grant of the land from the government; that, owing to some defect in the artificial horizon used in determining latitudes, the latitudes given on the map made at that time are not correct, and the error, whatever it may be, affects all the designations of latitude on the map; that the southern boundary-line, which, according to the map, lies in latitude north 38° 41′ 32″, was the estimated latitude of a point of land on the east bank of the Sacramento River, on the high ground southward of the laguna, below a town called Sutter, and is distant about four and one-half miles, in a southerly direction, from Sutter's Fort; that the line marked 38° 45′ 42″ was the estimated latitude of the place known as Sutter's Fort; that Captain Sutter came to this country in 1839, and settled that year at " New Helvetia;" that Sutter's Fort and " New Helvetia " were one and the same place ; that an exact duplicate of the original map made by witness at the same time with the original, was placed in the possession of Sutter; that afterwards, the witness made a true copy from the duplicate for himself, on vegetable transparent paper; that the map produced (afterwards offered in evidence) is, substantially, correct; that the courses of the Sacramento River, from latitude 38° 41′ 32″ up to its junction with Feather River, and the courses of Feather River and of the American River, as laid down on the original map, were taken by actual survey, but that the course of the Sacramento River, after its junction with Feather River, up as far as it is laid down on the map, was taken by sight from the Three Peaks; that witness made an actual survey of that portion of the tract which lies between the southern boundary and the Sacramento and American Rivers.

To the admission of the parol testimony of Sutter and Vioget, in explanation of the boundaries of the grant, and to fix the location of the land granted, the defendants excepted.

The following is a translation of the petition and grant, with a copy of the map referred to in the testimony of the witnesses :

[PETITION.]
*"Most Excellent Governor of this Department :*

" John Augustus Sutter, a native of the Republic of Switzerland, naturalized in the Mexican Republic, and residing in this Department, with due respect, represents to the notorious justice of Your Excellency :

" That, since he first arrived in this country, being desirous of

cultivating a part of the many vacant lands which it possesses, he solicited and obtained your superior approbation to establish himself on the land which he now occupies, accompanied by some industrious families, who chose to follow him.   In consequence of assiduous labor, his establishment now promises flattering hopes to himself, and advantages to the Department in general; for, stimulated by the example of his followers, industrious ideas are awakening in the other inhabitants of this country, and, at the same time, the place, from its situation, serves as a strong barrier to the incursions of the barbarous tribes to the settlements, and as a school of civilization, both to the barbarous natives, and to those subjected to the missions, who, in the long period of time that they have been under subjection, have never been useful members to society in general, as the undersigned has now the satisfaction to know that they will become, owing to his indefatigable labors.

" For all these reasons, the undersigned, in order to aggrandize his enterprise, and establish twelve families, is under the necessity of requesting of the goodness of Your Excellency, that you would be pleased to grant him eleven leagues of land, in the establishment named *New Helvetia*, situated towards the north, in exact accordance with the land designated on the plat* which he has the honor to accompany, not including in said eleven leagues the land which is periodically inundated with water in winter, and protesting to Y. E., and to the Mexican nation, that the existing laws of colonization, and all those connected with the subject, shall be faithfully obeyed by him. He therefore requests that Y. E., in virtue of the faculties with which the laws invest you, would be pleased to grant his petition, and, at the same time, interpose your powerful influence with the Supreme Government of the nation, for the purpose of obtaining its superior approval, by which favor the undersigned will receive a benefit, and the agriculture of the country support.                          " Most Excellent Sir,
           " (Signed)                           JOHN A. SUTTER.
" MONTEREY, June 15, 1841.

[GRANT.]

"*Juan B. Alvarado, Constitutional Governor of the Department of the Californias.*

"WHEREAS, Mr. Augustus Sutter, a native of the Republic of Switzerland, and naturalized in the Mexican nation, has, in conformity with the law of 18th August, 1824, and regulations of 21st November, 1828, asked, for his personal benefit, and that of twelve families, eleven leagues of land, on the margins of the River Sacramento, in the vacant lands of the frontiers of

---

* A substantially correct copy of the plat is given on the opposite page.—REPORTER.

the North, to colonize and improve them, in the terms mentioned in said laws, to which end he has sufficiently accredited his laboriousness, good conduct, and other qualifications, required in such cases; and has already, in advance, manifested his great efforts, his constant firmness, and truly patriotic zeal, in favor of our institutions, by reducing to civilization a large number of savage Indians, natives of those frontiers; and this Government, being sufficiently informed that said lands do not belong to the private property of any individual, town, or corporation, and that, consequently, they belong to those classified in said laws;

"I have, in conformity with the powers conferred upon me, in the name of the Mexican nation, *granted* to said Mr. Augustus Sutter, by these presents, for himself and his colonists, the said land named New Helvetia, subject to the approval or disapproval of the Supreme Government, and of the most excellent Departmental Junta, under the following conditions:

"1st. He may enclose it, without prejudice to the paths, highways, and privileges, particularly the traffic and navigation of the rivers.

"2d. He shall maintain the native Indians of the different tribes of those points, in the enjoyment and liberty of their possessions, without molesting them, and he shall use no other means of reducing them to civilization but those of prudence and friendly intercourse, and not make war upon them in any way, without previously obtaining authority from government.

"3d. The land granted to him consists of eleven square leagues, (*sitios de ganada mayor*,) comprehended in the extent designated in the plat which accompanies the *expediente*, without including the lands inundated by the impulse and currents of the rivers, its boundaries being: on the north, the Three Peaks, and latitude 39° 41' 45" north; on the east, the margins of Feather River; on the south, latitude 38° 49' 32" north; on the west, the River Sacramento.

"4th. When this grant shall be confirmed, he will ask the respective magistrate for possession of the land, in order that it may be measured, according to law, the surplus being left for the benefit of the nation, for the uses which may be required.

"I therefore command* that, holding this title to be firm and

---

*In the draft of the grant on file, among the archives, the concluding clause is as follows: "I therefore command that, holding this title to be firm and valid, a note of it be made in the proper book, and the *expediente* be forwarded to the most excellent Departmental Junta. Thus I, Juan B. Alvarado, Constitutional Governor of the Department, have commanded and required. Whereof I give testimony. Monterey, 18th of June, 1841." After 1837, the secretary did not make a full transcript of the grants, as issued, in any book of records. The draft of the grant remained on file, and from it the formal instrument was prepared, to which the Governor affixed his signature, and a minute was made of the grant, in a book kept for that purpose, giving the name of the grantee, the date of the grant, and the quantity of land granted.

valid, a note of it be made in the proper book, and that it be de-
livered to the party interested, for his protection, and other pur-
poses.

"Given at Monterey, the eighteenth day of June, one thou-
sand eight hundred and forty one.

"(Signed)                    JUAN B. ALVARADO.
"(Signed)                    MANUEL JIMENO, Secretary."

"A note of this decree has been made, in the Book of Decrees
in relation to adjudications of Vacant Lands, at folio 4.

"(Signed)                                    JIMENO."

The plaintiff traced title to the lots in controversy from Sutter
to himself.    These lots are included within the survey made by
Vioget for Sutter.    The defendants were in their occupation,
at the commencement of the action.    When the plaintiff
rested his case, the defendant moved for a nonsuit, on the fol-
lowing grounds: *first*, that the plaintiff had not shown that the
grant to Sutter includes the land in controversy; *second*, that
the title of the plaintiff was shown to be imperfect and inchoate;
and, *third*, that there was not sufficient evidence of prior posses-
sion to enable plaintiff to recover.    The motion was overruled,
and the defendants excepted.

One of the defendants, Krause, offered in evidence a tax-deed
of a portion of one of the lots in suit, which was rejected by the
Court.    The deed was executed to one Madden, by the sheriff
of the county, upon a sale for unpaid taxes, for the year 1853.
The deed was not under seal, and contains, in its recitals, the
following extract from the assessment-book.

| Owner. | Fraction. | No. Lot. | Block. | Val. | Val. Imp'ts. | St. Tax. | Co. Tax. |
|---|---|---|---|---|---|---|---|
| —— | E 70 No. 30 of S 70 | 5 | M and N 2 and 3 | | | | |

It was not assessed to the owner, occupant, or unknown
owners.    The defendants then offered to show that if plain-
tiff ever had, by himself or any of his grantors, any possession
of the premises in controversy, actual or constructive, he had
abandoned that possession, for upwards of six years; but the
Court refused to admit the evidence, and to the ruling the de-
fendants excepted.

The defendants had made improvements upon the lots occu-
pied by them, to the value of several thousand dollars.

The Court gave to the jury the following instruction :

"If you believe, from the evidence, that the lots in contro-
versy are embraced within the *boundaries of the map* introduced
before you, in this case, and that the map is a correct copy of
the original map delivered to John A. Sutter, at the time he got

his grant from the Mexican government, the plaintiff is entitled to recover. You must take the grant and map together, and if you believe the land in this suit *is within the grant, as explained by the map*, you will find for plaintiff."

To this instruction, the defendants' counsel excepted.

The defendants' counsel then requested the Court to give the jury the following instruction, which the Court refused to do, and to the refusal, exception was taken:

" If you find that plaintiff, or his grantors, or some of them, stood by and saw defendants making valuable improvements, and did not interfere, nor give any notice of an adverse claim to the lots, then you are entitled to find for the defendants."

Other exceptions were taken by the defendants, on the trial, but they were either expressly waived, or not pressed on the appeal. The exceptions stated raise all the questions argued on appeal.

The jury found that the plaintiff was entitled to the lots in controversy, and to their possession, and also found the value of the improvements placed upon the lots by the different defendants.

The Court rendered judgment for the plaintiff, without regard to the finding in respect to the improvements. A motion for a new trial was made and overruled, and the defendants appealed, both from the judgment and from the order denying a new trial.

*John H. McKune* for Appellants.

1. The defendants objected to the introduction of the grant to Sutter, because, *first*, it was imperfect, inchoate, and incomplete; *second*, it does not include the land in controversy in this suit.

The questions of law raised in this connection, are:

1. Is an unconfirmed floating concession evidence of legal title in the grantee of sufficiently high character to sustain ejectment?

2. Can parol testimony be introduced to vary a written instrument?

3. If parol testimony may be introduced to explain the grant and map, is there any such explanation of terms thereof as will warrant a recovery?

The first of these questions is discussed and decided in the cases of Leese and Vallejo *v.* Clark, 3 Cal., 16, and Vanderslice and Clarkson *v.* Hanks, Ib., 27, wherein it was decided that a mere concession, not approved by the Departmental Assembly, would not support ejectment.

This doctrine has never been overruled by any decision of this Court.

The matter was referred to by Murray, C. J., in rendering the decision in Gunn, (Administrator,) *v.* Bates, 6 Cal., 263, and his dictum indicates that on that question his opinion has been changed by the decision of the U. S. Supreme Court, in Fremont

*v.* The United States, 17 How., 542. But Judge Terry, who alone united in rendering the decision in Gunn *v.* Bates, expressly dissents from the opinion of the Chief Justice, and places his assent to the decision on a different ground.

So far as the decisions of our own Supreme Court are concerned, the law is settled that such incipient concession will not support ejectment.

If this dictum of the Chief Justice unsettles the law, the question may be regarded as an open one, and we will proceed to examine how stands the law :

1. By our statutes ;

2. By common law, and the course of decisions of our Courts of last resort.

By the statute, (Sess. Laws, 1856, p. 54, § 1,) all lands in this State are, in our Courts, to be regarded as public lands till the legal title is shown to have passed from the government.

By section three of that act, it is provided that the rights of parties claiming title under patents, shall be deemed to begin at the date of the patent.  These provisions are made in view of the law as decided by this Court in Vanderslice *v.* Hanks, and with the evident intention on the part of the Legislature to establish a rule of decision for the Courts in such cases.

By the first section, it is required that the party plaintiff shall show that the legal title has passed.  How do legal titles pass ? Under our statute, by deed signed by the party grantor.  But when the government is the grantor, it must be shown by proper instrument, or it may be by a law containing words of grant. But the whole instrument must show that it is the final document.  An incipient interlocutory paper will not pass title.  Such a concession, then, will not show title to have passed even from the Spanish government.  But the statute says the showing must be that the title has passed from the government.  What government ?  Evidently the government of the United States.

By the act of 1851, organizing the Board of U. S. Land Commission, it is provided that all land-titles in this State shall be passed in review before that commission, and that all land shall be deemed public the title to which shall not be confirmed under that law.  That act provides for the issuance of a patent from the United States to the claimant for all lands the title to which shall be confirmed.    .

In view of this state of facts, our Legislature established the rules above stated, and they seem to contemplate that our Courts are to consider the title to lands in this State as held in abeyance by the government until the patent issue, and the right of the claimant is deemed to accrue at the date of the patent.

There is less hardship in this rule than to hold the opposite doctrine, that even before the claimant himself knows where his

land will be, he can prevent the settlement of a much larger tract than he claims, by suing and recovering of parties found thereon.    The hardship to claimants resulting from the rule for which we contend, does not occur from any act of parties holding adversely.    It results from the indefinite, imperfect character of the interest the claimant possesses.    Thus it is with all imperfect rights.    The party must perfect them before he can sue and recover.

This is precisely what the claimants of land in this State, under Mexican grants, are now proceeding to do.    But why is John A. Sutter now asking the government for a patent, if his title is good without it?    If it is now perfect, a patent will not add to its perfection, and the proceedings before the United States Court, to obtain a patent, are a farce.

II.    But it is said that the decision of the U. S. Supreme Court in the Fremont case has overruled the previous decisions of that Court on that point, and established a different rule.

That Court have not, in terms, overruled their decisions in former cases, arising under the Louisiana purchase.    They have, however, taken a new departure, but they predicate their change of ruling on the differences and want of uniformity between the cases.

It is said that the late decisions of the U. S. Supreme Court go to the extent of the establishment of a rule, that concession passes complete title to the land mentioned in the grant.    I submit that such is not the rule established.

In stating this question, the Supreme Court, say:    "The point to be decided is, whether the grant vested in Alvarado any present and immediate interest."

Chief Justice Taney, in delivering the opinion of the majority of the Court, avoids stating that the concession vested a title to the land in Alvarado.    But the decision is, that he, by virtue of the grant, acquired a vested interest in ten leagues of land, which our government was bound to respect and perfect, and the Court say:    " If, at the time the sovereignty of the country passed to the United States, any interest, legal or equitable, remained vested in Alvarado, or his assigns, the United States are bound in good faith to uphold and protect it."    Why refer, in that case, to equitable claims if the grantee had legal title ?    Why the proceedings at all, in that Court, if Fremont had legal title which could be enforced in our local Courts?    The Court, in effect, admit that Alvarado had not legal title when they say that if any other person within the limits when the quantity granted to Alvarado was to be located, had afterwards obtained a grant from government by specific boundaries, before Alvarado had made his survey, the title of the latter grantee could not be impaired by any subsequent survey of Alvarado.    Now, the idea of a grant is inseparable from the idea of the thing granted.

If the thing granted is not ascertained, whatever rights may exist in equity, the grant will be void at law.  See, on this point, 13 Smedes and Marshall, 381; 4 Phillipps' Evidence, C. and H.'s Notes, 526; 4 Mass., 205; 4 Devereaux, 373; 13 Mo., 430; 1 Cowen, 285; Johnson v. Shelton, 4 Iredell's Equity, 85; 4 Phillipps' Evidence, C. and H.'s Notes, 526.  And a distinction is evidently drawn between cases where a government is a party, and where the litigants are private persons.  See case in 4 Iredell, supra, where the doctrine seems to be held that while the government is holding out inducements to settle, a void description may be corrected or made operative; but that the legal title still rests in government, and may be passed to a subsequent grantee, who would hold against a prior grant with defective description.

To hold that Fremont had a title on which he could recover in ejectment before he got his patent, would establish the following absurd propositions:

1. A person could hold the legal title to land not susceptible of ascertainment by the terms of the grant under which he claims; or,

2. He would hold the legal title to the whole land within certain boundaries, when the title under which he holds limits the quantity, and reserves the whole surplus.

3. It would establish the doctrine that rights vested under the grant could be divested by subsequent survey and location, according to the terms of the grant.

But full force and effect can be given to the Fremont decision, and still maintain intact the rules of law heretofore held to govern such cases.  The Fremont case does not decide that Fremont had legal title to the tract called " Las Mariposas."  It decides he had a vested interest in so much land, which amount of land he could take and receive the legal title therefor, by doing the following acts :

1. He must procure a confirmation of his grant;

2. He must procure a survey to be made by a proper officer;

3. He must apply for and take his patent, after which have the legal title to the land described in his patent.

III.  The Judge, in this case, instructed the jury that if the land in controversy was within the map put in evidence, they must find for the plaintiff.  Now, the amount of territory represented on that map is not less than five hundred square leagues.

Is it possible that under a claim of eleven leagues, that extent of territory can be held ?

If it can not, then there was error in the charge of the Court, and the judgment must be reversed.

IV.  The particular point now under discussion, "Are the rights of the original grantee,.John A. Sutter, perfect and complete?" can not be held in the affirmative without deciding that the right

thus complete comprehends the full extent of the description, because no segregation of the land granted from the public domain has as yet been effected.

The eleven leagues granted lie, as yet, within a larger tract, any eleven leagues of which may be taken in satisfaction of the grant; and until the location is definitely made, the right of the claimant is incomplete.

V. How is this segregation to be effected? Clearly in the manner pointed out by the act of 1851.

I do not discuss the question whether a legal title may be passed, under Mexican rule, by a concession, approved by the Departmental Assembly. That does not arise in this case. But it clearly does not pass without segregation, and the Court below holding the opposite, such ruling is error.

VI. But even if this Court should hold otherwise, the defendants are still entitled to judgment.

On the trial below, the plaintiff, to make out his case, offered in evidence an original grant to John A. Sutter, dated June 18, 1841, for eleven leagues of land on the margin of the River Sacramento, and more particularly described as follows: "The land, of which donation is made to him, is of the extent of eleven square leagues, as exhibited in the *deseño* (sketch) annexed to the proceedings, without including the lands overflowed by the swellings and currents of the rivers.

"It is bounded, on the north, by the Three Peaks, (*Los Tres Picos*,) in 39° 41′ 45″ north latitude; on the east, by the margins of Feather River; on the south, by parallel 38° 49′ 32″ of north latitude; and on the west, by the river Sacramento."

The above description contains a reference to a sketch, and a copy of a map is introduced in evidence.

By reference to the *deseño*, it will be seen that the words of description confine the land granted to the territory between the Sacramento and Feather Rivers and certain mountains forming prominent and well-defined and well-known landmarks, and the land sued for lies without, south of, and some twelve or fourteen miles distant, from the most southern boundary of the land described in the grant.

The Court admitted the parol testimony of Vioget and Sutter, to vary the terms of description contained in the concession, against the objections of the defendants, and they excepted.

Is parol testimony admissible to vary a written instrument?

The authorities answer the above question in the negative. Johnson v. Shelton, 4 Iredell Equity, 85; 2 Phillipps' Ev., 300, 282, 285, 326, 332, 534; 3 How. Miss. Reps., 230; Kea v. Robinson, 5 Iredell Equity, 373; 1 S. C. State Rep., 300; 4 Mass., 196; 18 John., 107; 1 N. H., 93; Mesick v. Sunderland, 6 Cal., 297. And known and established monuments control in matters of

description.  4 Bacon's Abridgment, 525; 2 Mass., 380; 2 Caine's, 367; 1 J. R., 157; 2 J. R., 37; 4 Phillipps' Ev., C. and H. Notes, 548.

The counsel for respondent cites Conn et al., 1 Peters' C. C. Rep., 496, as establishing the familiar rule that courses and distances in a survey are controlled by fixed and permanent monuments.  That rule undoubtedly applies to proper cases. But here was no survey, except for exploration, and no course or distance set down by Vioget.  But there are natural, fixed, permanent, unmistakable objects set down in the map, which are referred to by, and adopted into the grant, forming the description of the line within which the eleven leagues of land granted must be located.  These monuments consist of mountains and rivers, and they can not be disregarded or rejected as surplusage.

Courts of Law never supply words of description, but they frequently reject, if different words of description conflict and are inconsistent with each other.  Those words which refer to objects less fixed, and liable to be mistaken, in such cases would be rejected, and if, after rejecting those words as surplusage, enough remains to fully identify the land, the Court will uphold the deed, and give effect to the description.  Now, apply this rule to the facts in this case, proved.  The Feather and Sacramento Rivers, flowing together, form two sides of a triangle; a line drawn east and west, through *Los Tres Picos*, forms the third.  Here, the boundary is complete, after rejecting all other words of description as surplusage.

It is said, by the respondents, that a mistake was made in this matter of description; that Sutter intended to petition for land lying south of the American River, and that the Governor intended to grant the land in dispute.  How is this to be ascertained?   The answer is plain: by the words of description contained in the grant; and parol testimony is not admissible to vary the words.   See authorities above cited.

Witness Vioget testifies that he made an exploration of the country for Sutter, in the latter part of 1840 or fore part of 1841, beginning with such exploration at a point on the Sacramento River some six miles south of the land in dispute, and continued his explorations till he was able to make the *deseño* offered in evidence.   This, however, was before the grant was made.

Did the survey give any right?   Certainly not; it was a private act.

What did give Sutter any right in the soil?   Not the survey, for that was the act of claimant; not the act of making the map, for the same reason.   To the grant, then, we must refer for origin of title, and so far as the map was adopted as a part of the grant by way of description, so far it is important in this case.

But for the purpose of wresting the words of the grant from their proper purport, to suit the views of interested parties, a theory is advanced which, if adopted, overturns the plainest rules of law.

It is insisted that the actual residence of Sutter must be included, and that the name "New Helvetia" gives locality; that a survey made before the grant, identifies the land and overrules the words of description. The name of New Helvetia had no locality, except that given by the grant, and this clearly and explicitly expressed, limited, and confined, by specific words of description.

The argument of the counsel for the respondent proceeds upon the hypothesis that a line of latitude must be held to be a more permanent landmark than certain fixed objects on the surface of the earth, and that the line of latitude is in conflict with the other calls in the concession, or that the plaintiff must recover. This is not a fair statement of our theory. There is no real or apparent inconsistency or mistake in the grant, and it is only when the respondent desires to float a claim confined by the terms of the concession between the Sacramento and Feather Rivers, to a point some twelve miles south of the junction of those rivers, that any difficulty arises.

By examining the *deseño*, it will be seen that the parallel of latitude, 38° 49' 32'', cuts the Sacramento River at or near its junction with the Feather River. This is the true location of that line. The concession and map are to be construed as one instrument, and the *deseño* can only be used by way of description. That plat exhibits a territory lying between the foot-hills of the Sierra Nevada and the Coast Range; it then lays down the Feather and Sacramento Rivers, and the Butte Mountains; and the grant, referring to those objects, says the land granted lies between them—the latitude does not conflict with those words. In effect, the whole instrument declares that the land granted is in California, in the Department of the North, inside of the boundaries contained in the map, and further limited between two rivers and a mountain named; and, with the same show of reason, might we urge that the land granted lies on the west side of the Sacramento, as on the south side of the American.

It was urged, by counsel for the respondent, that the name of New Helvetia must control all other locative calls.

It is evident this must depend upon the questions under the circumstances:

1. Whether the locative calls in the concession, taken as a whole, are inconsistent; and if so,

2. Whether, under the rule, more force and effect should be given to the term New Helvetia, than to the rivers and mountains therein mentioned in locating the land.

The first of these questions has been partially discussed, and indeed it would seem to require no argument to prove that Sacramento and Feather Rivers are more certain in their location than the lines of a tract of land called New Helvetia, and that full force can be given to all the calls. The concession was dated June 18th, 1841. At that time there was no place named New Helvetia, having definite location. The name must be taken as meant in the instrument, and as explained by other words therein. There may have been other places called New Helvetia, and probably the fact was, that about the time he took his grant, Sutter intended to designate the whole of North California by the name New Helvetia. But the government was not authorized, or did not desire to grant him that entire territory, and accordingly the title was made out for eleven leagues in his establishment.

Now, it is evident that the entire of that establishment was not granted, otherwise there would have been words conveying the whole, and no words would have been inserted limiting the quantity to a particular number of leagues, within certain definite locative calls, containing less land than the whole establishment.

The question of intention must be determined by the language of the instrument, and can not be sought for in evidence *aliunde*, particularly when the instrument to be construed—as in this case—contains no patent ambiguity. If the foregoing remarks are correct, then the term "New Helvetia" was, at the date of the grant, too indefinite to give location to any eleven leagues of land. A grant of Blackacre might be good, if it was a certain piece of land having fixed boundaries, but a grant of eleven acres in the Blackacre tract, when that tract contained greatly more than eleven acres, would be void, as against third parties at least; but if the conveyance were for eleven acres in Blackacre, bounded definitely by natural objects mentioned in the deed, those objects would locate the land conveyed, and as well might the purchaser claim land outside those definite calls, as for the plaintiff in this case to claim the land in dispute.

VII. The defendant, A. F. Krause, offered in evidence a deed from the tax-collector, for State and county taxes for the year 1853, to James F. Madden, and from Madden to said Krause.

The plaintiff objected, because, by the deed, it appears that the property was assessed to unknown owners.

Section twenty-five of the Revenue Act of 1853 provides that "if the owner or owners of any property liable to taxation shall be unknown, it shall be the duty of the assessor, or his authorized deputy, to make a list thereof from the best information he can obtain, and attach thereto such valuation as he may deem just, and enter the assessment on his roll; and the assessment

thus made shall have the same force and effect as though it had been made by the owner."

In the same act it is provided that "if the owner shall fail to redeem a sale for taxes, the sheriff shall execute a deed of conveyance in fee-simple to the purchaser or purchasers, or assigns thereof, for said real estate and improvements, acknowledging said deed before some person authorized by law to take acknowledgments of deeds, and the sale shall become absolute, and said deed shall be *prima facie* evidence, in all Courts of this State, of the conveyance of all right, title, and interest in said property owned by delinquent at the time of sale."

The general design and scope of the act referred to, is to enable the assessor to levy, and the sheriff to collect the taxes, assessed. For this purpose, a deed made by the collector is made *prima facie* evidence of title.

The only question raised by the exception of the plaintiff is, does the fact that the assessor listed the lot to unknown owners avoid the force of the deed?

There is a direct provision in the act quoted above authorizing such assessment in cases where the owners are unknown. Unknown to whom? Answer : to the assessor.

Now, in this case, the fact that the owner and occupant were unknown, appears by the assessment, and the assessor acted within the strict letter of the law in thus listing the lot.

The requisition to list it in the name of the owner is directory, and only applied to cases where the owner or occupant was known to the assessor ; and even if the provision is not strictly proved, the deed is valid. 7 Barb. S. C., 133, 141; 21 Pick., 64; 1 Hill, 130; 19 Pick., 436; 20 Ib., 418; 3 Mass., 230; 21 Ib., 75; 1 Gilman, 160.

Den, on demise of Martin, *v.* Lucey, (reported in 1 Murphy's Law and Equity Rep., 311,) is a strong case, where it is held, *inter alios*, that it is not incumbent on a purchaser of lands, sold for taxes acknowledged to be due, to show on the trial of ejectment against him by the person who was bound and failed to pay the taxes, anything more by way of defence than the sheriff's deed for the land so sold.

In Read *v.* Goodyear, 17 S. & R., 350, it is held that lapse of time strengthened a tax-title; and failure to redeem might go to the jury as evidence of abandonment; and a tax-sale is good, though the property be taxed and sold under a wrong name. 1 Caines' Rep., 92; 11 Wend., 95; Metcalf, 470; 20 Pick., 418.

In a tax-sale, the title of the real owner, whatever it may be, passes to the purchaser, whether assessed in his name or a stranger, or whether the person in whose name it is assessed had any title or not. See 1 Watts & Serg., 166, 175; 16 Serg. & Rawle, 352; 9 Watts, 323; 7 Ib., 490; 2 Ib., 396; 5 Ib., 288. Even if the assessor might have ascertained the name of the owner or

occupant, his neglect to do so does not render his assessment void.    7 Barb. S. C., 133.

The authorities quoted sustain the doctrine that Courts will not inquire into every neglect of the assessor.    They will not, it seems to us, in this hold  that the fact existing that the assessor did not find the owner, where by further search he might have made the discovery, will vitiate the whole proceeding.    The Revenue Act authorizes an assessment to unknown owners, and if the owners were unknown, it still passes their title.    The authorities cited prove that the title passes by sale for taxes, even where the wrong person is named as owner.    Why, then, under statute authorizing its assessment to unknown owners, may not a sale pass title?

*J. W. Winans* also for Appellants.

I. Defendants, to sustain their defence, offered to prove an abandonment of the *locus in quo*, by the plaintiff or his grantor, but the Court ruled the evidence inadmissible.    To which ruling defendants' counsel excepted.

An abandonment may, as we contend, be set up as a defence in ejectment in all cases where the plaintiff does not rest his claim upon actual title.    Indeed, such was the view entertained by the Court below, but that Court held that plaintiff could recover upon actual title, and not upon prior possession acquired under color of title.

If, on the contrary, plaintiff did not recover upon actual title, but only upon possession obtained under color of title, the defence of abandonment can be sustained.

Plaintiff certainly did not recover upon actual title, because he sued on a Mexican grant, against which, among other things, an outstanding title in the United States was set up, and the tribunals of the United States have not yet finally adjudicated the questions involved in the case.

II. The parties through whom the plaintiff claims stood by and saw valuable improvements made upon the premises without disclosing their title; and as they would be estopped from setting up title against the occupant, so is the plaintiff.    Sayles *v.* Smith, 12 Wendell, 57.

The general principles relating to abandonment and estoppel may be set forth as follows:

Where a party makes any statement, or does any act which would operate as a fraud upon a third party, or which has induced a third party to act upon it, he is estopped from denying it.    2 Smith's Leading Cases, 531; Stephens *v.* Baird, 9 Cowen, 274; Dewey *v.* Field, 4 Metcalf, 384; Presbyterian Congregation *v.* Williams, 9 Wend., 148; Pickard *v.* Barrett, 6 Adolphus & Ellis, 469.

So, where the owner of property sanctions a purchase from a

third party, (as, for example, the purchase of defendants under their tax-titles and subsequent mesne conveyances,) whether such sanction be express or by implication, he will be estopped from setting up his own right to defeat the purchaser. 2 Smith's Leading Cases, 532; Lee *v.* Porter, 5 Johns. Ch. R., 268; Hatch *v.* Kimball, 16 Maine, 146; Storer *v.* Barber, 6 Johns. Ch. Rep., 166; Raugely *v.* Spring, 21 Maine, 137; Pickard *v.* Barrett, 6 Adolphus & Ellis, 467; Carr *v.* Wallace, 7 Watts, 394; 1 Martin & Y., 333.

Where the owner stands by and sees valuable improvements made on his land, without giving notice of his title, he will be estopped from setting up his title against the occupant. Hamilton *v.* Hamilton, 4 Barr, 194; Robinson *v.* Justice, 2 Pennsylvania, 19; Wendell *v.* Van Rensellaer, 1 Johns. Ch. R., 354; Higginbotham *v.* Barrett, 5 Ib., 589; East India Co. *v.* Vincent, 2 Atkyns, 83; 1 Bay, 239; Gray *v.* Bartlett, 20 Pick., 193; Shannon *v.* Broadstreet, 1 Schoales & Lefroy, 73; 1 Story's Eq. Jur., 385, 388, 389.

For a further and fuller exposition of the doctrine of abandonment and estoppel, see Cluggage *v.* Lessee of Duncan, 1 Serg. & Rawle, 122; Whitney *v.* Wright, 15 Wend., 176–178; Atchison *v.* McCulloch, 4 Watts, 13; McDonald *v.* Nulbollan, 5 Ib., 175; Jackson *v.* Walker, 7 Cowen, 641; 1 Greenl. Ev., 207.

In the case of Whitney *v.* Wright, 15 Wend., 178, which is very similar in principle to the present, the Court decides that the evidence of abandonment ought to go to the jury. The Court further holds the following doctrine:

" If the occupant abandon the possession, or, what is the same thing, suffer it to pass into the hands of a stranger, without any effort, within a reasonable time, to regain it, or any excuse for the omission, the original presumption in favor of his title must give place to another presumption in favor of a better right in the new occupant."

Applying the principles established by the case just cited, to the case at bar, it follows, conclusively, that the Court below erred in excluding the question of abandonment from the jury, and in ruling out defendants' evidence on that point.

III. Conceding, for the sake of argument, that defendant has failed to make out a defence, and that plaintiff is entitled to an affirmance of the judgment rendered in the Court below, yet still, under the equitable jurisdiction of this Court, defendant should be allowed a new trial, for the following reasons:

The effect of affirming the judgment of the Court below, without any modification, would be, or might be, to give plaintiff the possession of improvements erected by defendants in good faith, in ignorance of plaintiff's claim, of equal value with the land, and worth, in round numbers, $5000. It is true that defendants might have resorted to an equitable action, or set up an equita-

Los Tres Picos

Rancho de los Bortegas

Lindero Buba    Latitud Norte 39° 11'15"

Rancheria de

Rancheria

Tomscha

Rancho de Meckeleborg

Rancheria

Rancheria Indios Gentiles

Rancheria de Sicha

Rancheria de Hock

Rancho Ind

Rancho de Hock

TULARES Y TIERRAS ESTERILLES.

Rancho Olasch

Rio del Sacramento

Rio de los Tllamas

TULE

Latitud 39° 1'15"

Rancheria

TULE

Latitud 38° 45'49"    Rancheria    Rio de los Americanos

Establa de Nueva Helvetia

Rancheria Rio Grandes    Tierras Esterilles

Lindero    Latitud Norte 38° 41'32"

MAPA DE LOS TERRENOS PARA LA

COLONIA DE

NUEVA HELVETIA

ble defence in the Court below for relief *quoad* their improvements, thereby invoking the aid of the Court of Chancery, and their neglect to do this might be construed as a degree of laches which justifies the loss of their improvements. But it will be remembered that when this action was begun, and while it continued pending in the Court below, there existed a statute of our State, (supposed to be constitutional until this Court recently decided to the contrary,) which permitted defendants to be allowed the value of their improvements, and they, therefore, leaning as they did upon this statute, and setting up a claim to its benefits in their answer, and assuming it to be the law of the land, in the absence of any decision to the contrary, had no reason to resort to the powers or jurisdiction of the Court of Chancery, which could give them no further relief in this behalf, than what the then prevailing statute expressly guarantied to them.

As the decision of this Court, declaring the statute in question unconstitutional, has been rendered since the trial of this case at law, and shuts them out of the relief which the jury allowed them on the trial, viz., a proper compensation for their improvements, it is but right that the case should be sent back to the Court below for a new trial, so that defendants may amend their answer in such wise as to avail themselves of the equitable defences which this Court must see they possess.

*Thomas Sunderland* for Respondent.

I. Two questions, of great practical importance, arise in this case :

*First*—Does the grant to Sutter confer title sufficient to support the action of ejectment?

*Second*—If so, does the grant cover the premises in controversy?

The other questions are of minor importance, and will be noticed hereafter.

1. In Leese and Vallejo *v.* Clark, 3 Cal. R., and Vanderslice *v.* Hanks, Ib., this Court held that a mere grant of land, by a Governor of California, while under the Mexican government, and before the approval of the Departmental Assembly, conveyed an inchoate title only, and would not support an action of ejectment.

These decisions were founded upon the supposition that the condition, as to the approval of the Departmental Assembly, was a condition precedent, and no such approval being proved, the the legal title was held to be in the United States.

In the case of Fremont *v.* the United States, 17 Howard, 542, the Supreme Court of the United States decided all the conditions of the grant to be subsequent. If the conditions be subsequent, then the estate became absolute in Sutter the instant the grant was made. See 2 Blk. Com., 157. In the case of Fre-

mont, above cited, the Court, on page 558, say : " The words of the grant are positive and plain; they purport to convey to him a present and immediate interest." If there was a present and immediate interest conveyed, did not the right to possess and enjoy result as a necessary consequence ? What present right or interest was conveyed, if a mere intruder might dispossess the grantee ? What interest, less than possession and the right of possession, can be conveyed ?

This action is merely a possessory action, and many of the rules laid down by Courts, as to the kind of title which alone will support ejectment, are inapplicable to our present action for possession. It is not an action of right to determine the title. The simple question is, who has the better right to the possession, the plaintiff or defendant ? If, then, the grant was only a mere license to Sutter, to take and hold possession of the land granted, it gave him the right to maintain an action for possession against all the world, except the grantor, entering after condition broken, or a party holding the legal title from the government.

After the decision in the Fremont case, this Court changed the rule laid down in the cases of Leese and Vallejo v. Clark and Vanderslice v. Hanks. In Gunn v. Bates et al., 6 Cal., 263, the Court say : " The land belonged either to the United States or the claimant under the Mexican grant. If the federal government accedes to the right of the grantee, not on the ground of a confirmation of a prior equitable interest, but on the ground that he held a perfect title, who shall gainsay it ? Certainly not a mere intruder. It would appear strange, at least, when the federal government had established a tribunal, with authority to decide these questions, that the Courts of this State should be found arrayed against those decisions, questioning the rule by which she voluntarily abandoned her claim of title, and asserting for her rights which she had already disclaimed, through the solemn adjudication of her Courts. There can be no subserviency of opinion, in this Court yielding to a decision made between the United States (to her prejudice) and one of her own subjects, where they alone are interested; and the interference of the judiciary of California, under such circumstances, would be Quixotic in the extreme."

In Billings v. Hall, 7 Cal., 3, this Court again refer to the Fremont case, as having changed the rule established in the cases in 3 Cal. R. There they say : " The decisions of this Court, prior to the decision of the Fremont case by the Supreme Court of the United States, have prevented the holders of bona fide titles from commencing suits for the recovery of their property." The title, in this last case, is the same as the title of the respondent in the present case. From these decisions, I can not doubt that this Court will follow the decisions of the Su-

preme Court of the United States.  While that determination remains, the title of the plaintiff must be held sufficient to maintain this action.  Since the Fremont decision, the Supreme Court of the United States have gone further, and decided, in so many words, that the grant itself confers an absolute fee-simple title, the very doctrine contended for by respondent.

In United States *v.* Peralta, 19 Howard, 348, the Court say : "The grant by Sola," (then under consideration,) "of a portion of the tract of which Peralta had been originally put in possession, is a complete grant in fee for that portion."

Again : in United States *v.* Sutherland, Idem, 365, the Court say : "The patent to the claimant's mother conferred a title in fee to an estate, known by the name of 'El Cajon,' or 'The Chest.'"  This language of the highest judicial tribunal of the land leaves no room to doubt what the opinion of that Court is. It is plain and to the point.  It would seem that in that Court the question is no longer doubted, or even discussed ; for the quotations above contain all that is said upon the question.  It is true that, in the case of Sutherland, there was the approval of the Departmental Assembly, but they give to such approval no importance, and speak of the patent (grant) which issued prior to the approval of the Assembly.  No title or evidence of title issued after the approval; none seems now to be considered necessary.

As a matter of argument not easily answered, I refer the Court to the opinion of Justice Heydenfeldt, in Vanderslice *v.* Hanks, 3 Cal. R., 27.

Conceding, however, that the legal title did not pass, still the plaintiff is entitled to recover.  Some kind of title or right did pass.  This is not disputed.  Whatever right Sutter had, by virtue of his grant, was protected by the treaty between the United States and Mexico.  Prior to the treaty, Sutter had the undisputed possession of the land granted, claiming title to the same.  No one held adversely, or claimed to do so. There had been no forfeiture of this right to the possession by Sutter—no re-granting of the land to another—no denouncement by a third party—no act by the grantor or grantee, during the continuance of the Mexican government, evidencing an intention on the one part to resume the possession, or on the other to abandon the same.  The actual possession, then, of a part of the land, claiming under title, extended the constructive possession to the limits of the land granted, and the plaintiff must recover on his title, proved by prior possession.

It is objected, however, that the grant contained more than eleven leagues of land, and as only eleven leagues were granted, the plaintiff can not recover.  This objection is not valid, for many reasons.  There is no proof that the quantity embraced within the limits of the grant exceeds eleven leagues, and the

39

Court will not draw any such inference, unsupported by proof. The map was before the Governor when he made the grant. It is not to be presumed he was mistaken as to quantity, until that fact is proved.

Again : there was reserved from the grant all lands inundated by the currents of the rivers. What quantity was or is so covered, is not, and can not be known, until an actual survey. But whether more or less than the eleven leagues was embraced within the lines named in the grant, can make no difference. The whole passed to the grantee. Such was declared to be the law in the case of Vanderslice v. Hanks, supra. Although the judgment in that case was subsequently reversed, it was upon other grounds.

Again : it is a rule adopted by the Land Office Department, and one by which Courts ought to be governed, to allow the grantee, after the survey, to elect which part of the land he will take, in case there is an excess. The rule goes further, and makes a sale by the grantee, before the survey, an election, and the government will thus compel him to act in good faith to his grantees. The premises in controversy were sold by deed of warranty, and thus Sutter elected to take those particular lots as a part of his eleven leagues.

For these reasons, and upon these authorities, it is urged that the objection to the grant, on account of the excess in quantity of land over and above the eleven leagues, is not valid.

2. Does the grant cover the land in controversy ?

The southern boundary named in the grant, 38° 49′ 32″ north latitude, is located, as now ascertained, near the junction of the Sacramento and Feather rivers, and, for this reason, it is insisted, by appellants' counsel, that the grant can not cover the *locus in quo*. If there were no other guide to determine the southern boundary, the latitude named would be conclusive. But in this, as in all such grants, a map accompanied the petition, and was made a part of the grant, by special reference thereto. The petition asks for the land in exact accordance with the map. The grant also refers to the map, and grants according to the same. The map, therefore, becomes a part of the grant, and, for description, must control the words of the grant. " When lines are laid down on a map or plan, and are referred to in the deed, the courses, distances, and other particulars appearing on said plan, are to be regarded as the true description of the land conveyed, as they would be if expressly recited in the deed." 17 Mass., 211; see, also, United States v. Sutherland, 19 Howard, 363. The description in this last case is the land known as " El Cajon," and " the land of which grant is made is that which the map attached to the respective *expediente* expresses." There can be no other object in preparing a map, and it can serve no other purpose than to describe the

land granted. If the grant and map are to be construed together, it can easily be seen that there was a mistake in the latitude named in the grant as the southern boundary. At the extreme southern part of the map there is found a line crossing the river, and called a boundary-line (*lindero*.) This is the same word used in the grant, and translated *boundary*. It therefore seems clear that this line was intended as the southern boundary. It is marked latitude 38° 41′ 32″. This map was before the Governor when he made the grant, but, by some mistake in drawing the grant, the figure 9 was inserted in place of the figure 1, which mistake might easily occur.

That there was a mistake, is proved by the fact that no line marked on the map answers to the latitude called for in the grant. It being proved by the grant and map that there was a mistake, parol evidence can then be introduced, to correct the mistake. The thing intended to be granted is the thing granted. Greenleaf, in his note to section 301, (Greenl. Ev.,) lays down the following rules, in cases like the present: "1. The highest regard is had to natural boundaries; 2. To lines actually run, and to courses actually marked, at the time of the grant; 3. To courses and distances, giving preference to one or the other, according to circumstances." "Evidence of long continued occupation, though beyond the given distances, is admissible." See, also, 17 Mass., 210; 9 Cranch, 178; 7 Wheaton, 7; 2 Ib., 306.

In confirming the claim of Sutter, Judge Thompson says: "The circumstances surrounding the parties at the time the grant was made, the language, both of the petition for the grant and the grant itself, show, conclusively, the intent and meaning of the instrument. Capt. Sutter had, some three years before, with the sanction of the government, located himself at a place near the junction of the American and Sacramento Rivers, and had, at great expense and labor, built up an extensive settlement in that locality, which, in honor of the land of his nativity, he named New Helvetia. It was natural to suppose that he would be desirous of indemnifying himself for his trouble and expense, and of obtaining the means of remunerating the settlers whom he had induced to join him in his enterprise, by securing a title to those lands whose value had been thus enhanced by their common efforts, and on which their settlements were established. To suppose that Capt. Sutter, in soliciting, and the Governor, in granting the land, should have intended to exclude that portion on which all this money and labor had been expended, and which was principally looked to as the reward for three years of toil, privation, and danger, in an unsettled wilderness, is an assumption so improbable, not to say absurd, so inconsistent with the terms of the grant, and the motives which usually influence human conduct, as to be utterly irreconcilable, either with the rules of evidence applicable to the subject, or the plain-

est dictates of reason or common sense." See, also, McIver v. Wharton, 4 Wheaton, 444.

By the testimony of Vioget, it is proved that, before the grant was made, Sutter employed Vioget to survey the land, and make a map of it; which map, the result of the survey, accompanied the petition of Sutter. The survey commenced on the east bank of the Sacramento River, about four and a half miles below the mouth of the American River. The line surveyed as the southern line ran on the margin of two lagunas, laid down on the map. The survey included two leagues of land south of the American River, including, also, the land in dispute.

Vioget's testimony also proves a mistake in the latitude, and that the latitude named on the map was intended to be the latitude of the line marked on the map, as the southern boundary before spoken of. He says that, in taking the latitude, the instrument used by him was defective, and that whatever mistake occurred in one line, occurred in all.

This statement is corroborated by the map introduced by defendants. This shows the northern boundary-line, according to the designation of latitudes named in the grant, instead of running through the Buttes, runs at least twenty miles north of them.

It is also proved by Vioget, that Sutter had already commenced his improvements at the Fort. Is it likely that Sutter would cause a survey to be made of lands, and petition the Governor therefor, and exclude all his improvements, his actual residence, and lands by him brought under cultivation? Here were his workshops, his tannery, his manufactories of different kinds; here his stock ranged; here was his Fort, erected to defend himself and employees from the savages.

In addition to these facts, we find on the map the lagunas— the American River—the establishment called New Helvetia— the River Sacramento. These are natural objects, whose locality is not changed; they occupy the several places designated on the map.

A mistake in the latitude, taken in early times, with imperfect instruments, or by an unpracticed hand, is certainly not to be wondered at, when the latitude of the Fort is still unsettled. Until recently, the longitude of the coast of our State was unknown, and the loss of many vessels, including one or more belonging to the general government, was the consequence. When scientific men, sent out by the former government, made a mistake of more than half a degree, in the longitude of our coast, is it surprising that Vioget should have made a mistake of some twenty miles? And when that mistake is proved, beyond controversy, will the Court confine Sutter to a line named in the grant as the southern boundary, against all the evidence introduced to prove and to establish the line? I trust not.

The decree of the Board of U. S. Land Commissioners, and that of the U. S. District Court, establishing the boundary, though not absolute authority, are entitled to respect, and the Court is referred to those decrees.

II. One of the defendants, Krause, offered in evidence a tax-deed, which was rejected in the Court below. This deed does not cover, as claimed by appellants, the premises in possession of defendant Coover, but only her own.

The deed contains an extract from the assessment-book, by which it appears that the land was not assessed to the owner, occupant, or unknown owner, but to ————. The sale was for taxes of 1853. It is void, because the extract shows there was no valuation of the lot by the assessor. There was no amount of taxes extended on the line opposite the lot, as required by law.

The other deeds, offered by defendants, were made by parties who had no title to convey, and, consequently, they could convey no right to defendants. It is contended, however, that these deeds prove that defendants had entered into possession in good faith, and made lasting improvements. For what purpose this argument is urged I know not. The decision in Billings v. Hall is not called in question.

III. It is contended, by appellants, that the Court erred in refusing to allow them to prove an abandonment of the possession of the premises. If the Court below was right in believing that plaintiff had proved title, then there could be no abandonment. When there is a bare, naked possession, without title—in other words, when the only evidence of title is possession, that possession, and the right growing out of the possession, may be abandoned; but when a title, either legal or equitable, is proved, there can be no abandonment. The abandonment of the possession is not abandonment of the title, and that some kind of title passed to Sutter, by virtue of his grant, will hardly be doubted. The whole argument of appellants, upon this point, is based upon the supposition that plaintiff showed no title. The authorities cited by them are mostly upon the question of estoppel, and have no bearing, in any way, upon the question of abandonment.

IV. It is urged that the following instruction of the Court to the jury was wrong: "If you believe, from the evidence, that the lots in controversy are embraced within the boundaries of the map introduced before you in this case, and that the map is a correct copy of the original map delivered to John A. Sutter, at the time he got his grant from the Mexican government, the plaintiff is entitled to recover. You must take the grant and map together, and if you believe the land in this suit is within the grant, as explained by the map, you will find for plaintiff."

The map and grant are to be taken together, and, thus taken, the instruction was clearly correct.

FIELD, J., delivered the opinion of the Court—BALDWIN, J., concurring.

These were actions of ejectment, to recover the possession of two lots, situated in the city of Sacramento. By agreement of parties, they were tried together. The plaintiff deraigns his title from John A. Sutter, to whom a grant was issued by the Mexican Governor, Juan B. Alvarado, in June, 1841, and the principal questions raised by the record are : *first,* whether the grant confers title sufficient to support the action of ejectment; and, *second,* whether parol evidence is admissible in explanation of its boundaries, and to fix the location of the land granted.

The original grant to Sutter was destroyed by fire in 1851, and a proved copy was read in evidence. The authority of the Mexican Governor to make this grant, was not denied on the trial; nor was any question raised as to the regularity of the proceedings upon which it was issued; but it was urged, as objections to its introduction in evidence, *first,* that it was imperfect, inchoate, and incomplete; and, *second,* that it does not include the premises in controversy.

The instrument does not confer a mere permission to occupy the land described therein, but in terms *grants* the land itself. After reciting that Sutter has petitioned, " *in conformity with the law of the 18th of August, 1824, and regulations of the 21st of November,* 1828," for eleven leagues of land for his benefit, and that of twelve families, and referring to " *his good conduct and other qualifications required in such cases,*" and to " *his great efforts, his constant firmness, and patriotic zeal,*" in favor of the institutions of the country, it proceeds to state that the Governor, in the name of the Mexican nation, and in conformity with the powers conferred upon him, has " granted " to Sutter, " *by these presents,*" for himself and colonists, " *the said land named New Helvetia,*" subject to the approval or disapproval of the Supreme Government, and the Departmental Junta, upon certain conditions; and in its concluding clause the instrument states that the Governor, " *holding this title to be firm and valid,*" directs a note of it to be taken in the proper book, and its delivery to be made to the party interested, for his protection.

The words of this instrument are plain. They import a conveyance of the land in full property, subject, indeed, to be defeated by the subsequent action of the Supreme Government and Departmental Assembly. The clauses against the obstruction of the highways, and the navigation of the streams, are not properly conditions, but reservations in favor of the public. The condition as to the maintenance of the Indians of the different tribes in their possessions, and the conditions of the regulations of November 21st, 1828, requiring the cultivation and occupancy of the land with families, are necessarily conditions subsequent, which did not prevent the estate from becoming vested *eo in-*

*stante* with the delivery of the grant, and for a non-compliance
with which the estate could only be divested by the action of
the government. The grant to Sutter does not contain the con-
ditions as to the settlement and occupancy of the land with
families, to which *empressario* grants were subject by the regu-
lations of 1828. This omission may have arisen from the fact
stated in the petition of Sutter, and which must have been
known to the Governor, that he had already established himself,
*" accompanied by some industrious families,"* upon a portion of the
land for which he petitioned. The object of the decree of 1824,
and the regulations of 1828, was the settlement of the vacant
lands of the republic, and, for that purpose, grants like the one
to Sutter were subject to the conditions of cultivation or occu-
pancy, with a stipulated number of families, which it would be
unnecessary to insert when such cultivation or occupancy by
the petitioner already existed. But it is immaterial whether
we consider these conditions as intentionally omitted or as an-
nexed to the grant by force of the regulations. They are con-
ditions subsequent, for the non-performance of which the estate
might have been defeated by proceedings of the government to
that end; but until such proceedings were had, and a forfeiture
declared thereon, the estate remained in the grantee. Under
the Mexican law, as under the common law, an estate granted
by the government could not afterwards be divested upon mere
allegations or surmises. Some formal and regular proceedings
were requisite. Under the Mexican law, they had their incep-
tion in what is termed a *denouncement,* by a party desirous of
acquiring the land. When the denouncement was made, an in-
vestigation was had whether or not the conditions had been
complied with, or so disregarded as to authorize a declaration of
forfeiture. No re-grant was made upon a mere allegation that
the condition of the former grant had not been performed, with-
out an inquisition as to the fact.

In the case of Sutter, no denouncement was made, nor were
any steps taken by the government indicating any intention to
forfeit the land, nor is there any evidence of any such breach of
the conditions to his grant, on the part of Sutter, as would have
authorized a forfeiture, had proceedings to that end been insti-
tuted. So far, then, as these conditions are concerned, they did
not affect the title—that passed to Sutter, upon the delivery of
the grant.

Nor did the clause subjecting the grant to the approval of the
Supreme Government and Departmental Assembly prevent the
title from passing. That approval was not a condition precedent
to the vesting of the title. By the first article of the regulations
of 1828, the authority to make grants was lodged solely in the
Governor of the Territory. It was not shared by him with the
Departmental Assembly. That body possessed no power to

make any grant. Its power was restricted to approval or disapproval of the grant made. After its action, whether of approval or disapproval, it became the duty of the Governor to forward *the necessary documents, with the report of the territorial deputation,* to the Supreme Government. Until the approval of the Supreme Government, the grant was subject to be defeated. With such approval, it was discharged of the defeasance, and became *definitively,* that is, *finally,* valid, and passed the estate in the land to the grantee beyond even the power of government to divest, except by proceedings to work a forfeiture for breach of its conditions subsequent. The instrument in evidence is the " document " mentioned in the eighth article of the regulations, required to be given by the Governor, to serve as a title to the party interested, in virtue whereof *possession* was to be had. It is the document given upon obtaining the information mentioned in the third article, and after " acceding " to the prayer of the petition, as specified in the fourth article, and the only document which the Governor was ever required to give, and is the one upon the approval of which the grant was to be held definitively valid. This is the view taken by Mr. Commissioner Thornton, in his opinion in the Cruz Cervantes case, and by Mr. Justice Heydenfeldt, in the case of Vanderslice *v.* Hanks ; and this view appears to us to be correct upon a consideration of all the regulations. We are aware that Mr. Chief Justice Taney holds a different view in the Fremont case. He regards the eighth article as referring to a document intended as evidence that the conditions annexed to the grant had all been complied with. " It is not," he says, " required in order to give him a vested interest, but to show that the estate conveyed by the original grant, upon certain conditions, is no longer subject to them ; and that he has become definitively the owner, without any conditions annexed to the continuance of the estate." (17 Howard, 560.) It is immaterial for the decision of the present case, whether we adopt the construction of Mr. Commissioner Thornton and Mr. Justice Heydenfeldt, or of Mr. Chief Justice Taney, for they all hold that the original grant is the one by which the estate is vested.

As we have stated, it was the duty of the Governor, and not of the grantee, to submit the grant to the Departmental Assembly, and afterwards, with its report, to the Supreme Government. Any neglect or refusal of the Governor to make such submission could not impair the right of the grantee to the land granted ; nor could that right be impaired by any action of the Governor when the grant had been once made by him in conformity with the decree of 1824, and the regulations of 1828. Those regulations prescribe the manner in which grants should be made, and the cases in which his authority could be exercised. Once exercised, and the power of the Governor over the land granted passed. He could not recall or revoke his grant. His further

duty consisted in its submission to the Departmental Assembly and the Supreme Government. Until such submission, and the action of the government thereon, the definitive validity of the grant would remain suspended, and no other consequence could follow. Upon no principle of law or equity could the neglect of the Governor to discharge his duty operate to divest a party of an estate already vested in him.

In the present case, there is no evidence that Governor Alvarado ever forwarded the grant to Sutter to the Departmental Assembly, or to the Supreme Government, or of any action by either the Assembly or the government thereon; but the long occupation of Sutter of land claimed under his grant, and the frequent recognition of his title by the Mexican authorities, in their official documents, raise a strong presumption that the grant had the approval of both the Assembly and the Supreme Government.*

The views we have expressed of the conditions annexed to the grant of Sutter, and of the provisions subjecting it to the approval of the Supreme Government and Departmental Assembly, are in accordance with the decisions of the Supreme Court of the United States in the Fremont and Reading cases. The grants in those cases differ from the one to Sutter, in being grants for the benefit of single individuals, and not *empressario* grants, but the same principles of construction are applicable. In both of those cases the grants were subject to conditions and to the approval of the Departmental Assembly, and neither had received such approval. And the Court held the conditions subsequent, and the submission, the duty of the Governor, and not of the grantees; and that the neglect of the Governor only operated as a suspension of the definitive validity of the grants. In the Reading case, (18 Howard, 7,) Mr. Justice Wayne, in delivering the opinion of the Court, uses this language:

" It was also urged, that no title passed by the grant, as it had not received the approval of the Departmental Assembly. An examination of the decrees of the 18th of August, 1824, and of the 21st of November, 1828, leads us to a different result. A right and title passed by the Governor's grant, but its definitive validity was suspended for the approval of the Assembly; and so it continued to be suspended until its approbation had been given, when the title became definitive. But if that was refused, it did not take away, nor in any way qualify the grantee's title, but only kept its final validity in suspense until the grant had been rejected by the Supreme Government of the Republic; it being the duty of the Governor, after its rejection by the Assembly, to forward the documents of title to the Supreme Government for its decision.

* See note D.

"Further, we must infer from the same decrees, and particularly from the fifth article of that of the 21st of November, 1828, that it was the duty of the Governor, and not of the grantee, to forward grants of land given by him, to the Departmental Assembly. The latter might very well, after that had been done by the. Governor, solicit the approval of the Assembly personally, or by an agent, by all those considerations which had gained him the Governor's favor. But if the Governor failed to transmit the documents, from any cause whatever, the grantee's title continued to be just what it was when the grant was given. Nor could any neglect or refusal of the Governor to transmit his grantee's documents of title to the Assembly, take from him his right in the land if the grant had been made with a due regard to what the decree of the 18th of August, 1824, required, and in conformity with the cautionary regulations of that of the 21st of November, 1828. In other words, from our reading of those decrees, the Governor could not, either directly recall a grant made by him, or indirectly nullify it when it had been conferred conformably with them."*

If the approval of the Departmental Assembly and the Supreme Goverment were a condition precedent, then no title whatever passed by the grant of the Governor. The grant would, in that case, be only the first movement towards a title, and be no more operative as a conveyance than a bill passing only one house of the Legislature would be operative as a law. It would not even confer an equity, as that term is understood in our system, or constitute a claim upon the bounty of the government. The consequences of such a position would be startling. A great portion, probably the greater portion, of the lands held in this State, are claimed under grants which are subject to a similar condition of approval by the Departmental Assembly, or by the Supreme Government, and if such approval were essential to the passing of title, these lands could not be taxed, for the fee and the entire beneficial interest would be in the federal government, and its property we are inhibited from taxing. They could not be sold under execution; they could not pass by bargain and sale; they would not descend to the heir; nor could they be subject to administration as assets, as real estate is, in certain cases, under our law. It would be impossible to estimate the consequences of confusion and injury to which such a position would lead, carried to its necessary and legal results. But such approval, as we have already shown, was not a condition precedent. The title passed to Sutter by his grant; an estate vested in him, subject, it is true, to be defeated by the action of the Mexican government by direct rejection, or, in case of non-compliance with its conditions, by proceedings to that end.

* See notes A and B.

Under Mexico, it might have been submitted to the Territorial Assembly, reported against, forwarded to the Supreme Government, and been there rejected; or, in case the conditions of the regulations, as to cultivation or occupation of the land, had not been complied with, it might have been denounced, and, upon proper investigation, the estate declared forfeited. But, until one or the other of these proceedings had taken place, the title continued in Sutter unimpaired. Neither of these proceedings were had under the Mexican government, and, therefore, at the date of the cession of California to the United States, his title remained in full force. And that title was in no respect impaired by the treaty of cession. By the law of nations, independent of treaty stipulations, the inhabitants of a ceded territory retain all rights of property. "Had Florida changed its sovereign," says Mr. Chief Justice Marshall, in U. S. *v.* Percheman, (7 Peters, 86,) "by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new government would have been unaffected by the change. It would have remained the same as under the ancient sovereign. * * A cession of territory is never understood to be a cession of the property belonging to its inhabitants. The King cedes that only which belonged to him. Lands he had granted were not his to cede. Neither party could so understand the cession; neither party could consider itself as attempting a wrong to individuals, condemned by the practice of the whole civilized world. The cession of a territory by its name, from one sovereign to another, conveying the compound idea of surrendering, at the same time, the lands and the people who inhabit them, would be necessarily understood *to pass the sovereignty only, and not to interfere with private property.*"

Independent of the protection afforded by the law of nations to the property of the inhabitants of a ceded territory, the government of the United States, by the treaty of Guadalupe Hidalgo, expressly stipulated that those citizens of the Mexican Republic, in the territories ceded, who might elect to become citizens of the United States, should be incorporated into the Union, and be admitted at the proper time, to the enjoyment of all the rights of citizens of the United States, according to the principles of the Constitution, and in the meantime be maintained and protected in the free enjoyment of their liberty and property, (Article 9;) and all those citizens of the territories are considered to have thus elected, who, within one year after the exchange of ratifications of the treaty, did not declare their intention to retain the character of Mexicans, (Art. 8.) The stipulation for maintenance and protection, even if such maintenance and protection were not obligatory, independent of the treaty, operated until the admission of California as a State into the Federal Union; and, as a matter of course, since such admission,

those citizens are entitled to the same protection in their property which is afforded to other citizens of the United States. It is true, that the United States, in their political capacity, have succeeded to all the rights of Mexico, in respect to the grant to Sutter, so far as the Constitution and laws of their government allow the exercise of such rights, but it is equally true that rights and powers inconsistent with the principles of their Constitution and government can neither be taken nor exercised. "It can not be admitted," says the Supreme Court, in Pollard's Lessee v. Hagan, "that the King of Spain could, by treaty or otherwise, impart to the United States any of his royal prerogatives; and much less can it be admitted that they have the capacity to receive or power to exercise them. Every nation acquiring territory, by treaty or otherwise, must hold it subject to the Constitution and laws of its government, and not according to those of the government ceding it." (3 Howard, 225.)

The Supreme Government of Mexico possessed the power to reject, upon its own mere volition, an *empressario* grant to one of its citizens, made by the Governors of its departments, under the colonization laws, but it may be questioned whether this power, which the government exercised to control the action of its subordinate officers, passed to the government of the United States.

The only mode of avoiding an estate under the Mexican authorities, other than by the direct rejection of the Supreme Government, was, as we have already observed, by proceedings having their origin in what is termed a denouncement, which is entirely unknown to our laws. It may, therefore, be a question whether any right of defeasance or forfeiture, which may have existed in the Mexican government, in respect to the grant to Sutter, ever passed to the United States, and whether the grant did not, by operation of the treaty of cession, become discharged of all conditions. It is not necessary, however, to pass upon this question; it is sufficient for the disposition of the present case that the title of Sutter, under his grant, was in no respect impaired by the treaty. Under the former government, Sutter was entitled to the possession of the land under his grant; indeed, the conditions of cultivation or occupancy attached to it by the regulations of November, 1828. To avoid a denouncement, and a possible forfeiture of his estate, he was required to cultivate or occupy the land, and its possession was his right, which could have been enforced under the Mexican government. It was a right to the use and enjoyment of property, and as such was guarantied by the stipulations of the treaty. It accompanied his grant, and, like any other right of property, may be enforced in our Courts. The grant conveying, as we have seen, the title, carries with it the right to the possession, use, and enjoyment of the land, until, by the appropriate action of the general govern-

ment, the estate of the grantee is defeated—admitting that it is competent for the government to provide for defeating it.    It follows, that the action of ejectment will lie directly upon the grant to recover the land, or any portion thereof, embraced within its boundaries.

The decisions of this Court in the cases of Leese and Vallejo *v.* Clark, and Vanderslice *v.* Hanks, (3 Cal. Rep., 17, 47,) are in direct conflict with this opinion.    Those decisions were rendered previous to the decisions of the Supreme Court of the United States in the Fremont and Reading cases, and were based upon the opinion that the approval of the Departmental Assembly was a condition precedent to the vesting of the title in the grantees. The decisions in the Fremont and Reading cases led to a reconsideration, by the late Chief Justice, of the views advanced by him in the cases in 3 Cal. Rep., and in Gunn, Administrator of Sheldon, *v.* Bates, decided at the July Term, 1856, (6 Cal., 263;) he virtually abandoned them, not as unsound, but as overruled by the Supreme Court of the United States.

It is objected, by the defendants, that the grant to Sutter contains more than eleven leagues of land, and that the title did not pass, because the land intended to be granted was not segregated from the public domain.    It is a sufficient answer to this objection, that there is no evidence in the record, and none was offered on the trial, to show that the quantity embraced within the limits of the grant exceeds eleven leagues, after excluding the lands inundated by the currents of the rivers ; and it will not be contended that the Court will presume an excess in quantity in the absence of all proof.    The clause in the grant reserving any surplus which might be found upon measurement, for the benefit of the nation, is the usual clause inserted in all grants issued by the Mexican governors.    They were inserted to prevent mistakes or impositions as to the quantity granted.    By the regulations of 1828, the applicant for land was obliged to accompany his petition with a map, " describing, as distinctly as possible, the land asked for," and the requisite information as to the land and applicant having been obtained, the Governor was required, in the exercise of his discretion, to "accede or not," to the petition.    The grant followed the map in the general description of the land, without further survey, and to prevent mistakes or impositions as to the quantity, it was customary to insert a clause, reserving any surplus that might be afterwards found within the designated boundaries, upon a survey and measurement by the officers of the government.    But until it was legally determined, by such survey and measurement, that there was a surplus, no individual could complain.    The government alone could determine and set apart the surplus, and until its action in the matter, the right of the grantee remained good to the possession of the entire tract within the designated boundaries.    " On the

other hand," as is said by Justice Heydenfeldt, in Vanderslice *v.* Hanks, " if it was allowed (when the government did not complain) to any individual to enter upon the granted land and decide for himself that there was a surplus within the granted boundaries, to which the grantee was not entitled, it may readily be seen that by a combination of two or more such trespassers, the grantee might be deprived of all his land; for if one was allowed to resist his right on the ground of surplus, so might each one of many, after entering, contend and insist that he alone held and claimed the surplus; and thus the party who is the real donee of the government, and upon whom she designed to bestow her favors, would be stripped of his possessions for the benefit of others for whom no such provision was intended."

If the grant to Sutter had not designated any boundaries, or any point where the measurement of the land granted could commence, there would be great force in the objection of the defendants. The cases usually cited as authority, that a want of segregation of land granted, from the public domain, prevents the title from passing, are those in which neither boundary or description of any kind is given. But it is unnecessary to determine the question, as it does not properly arise in the present case.

The second objection to the introduction of the grant, was, that it does not include the premises in controversy.

Whether or not the premises are included within the grant, is a question of fact, to be submitted to the jury, and the only question for this Court to consider is, whether the parol testimony of Sutter and Vioget, in explanation of the boundaries, and to fix the location of the land granted, was admissible. The language of the grant, as to the boundaries, is as follows :

" The land granted to him consists of eleven square leagues, (*sitios de ganada mayor*,) comprehended in the extent designated in the plat which accompanies the *expediente*, without including the lands inundated by the impulse and currents of the rivers, its boundaries being : on the north, the Three Peaks, and latitude 39° 41' 45" north; on the east, the margins of Feather River; on the south, latitude 38° 49' 32" north; on the west, the River Sacramento."

As appears by this description, the plat, or map, which accompanied Sutter's petition, is referred to, and thus becomes a part of the instrument, for the purpose of identifying the land, and fixing its location.

The only object of the map was to identify the land, and enable the Governor to make the requisite inquiries, as to whether it was vacant or not, and thus within his power to grant; and, for the like purpose of identification, is the map referred to in the description, and it is, for that purpose, to be regarded as a part of the grant itself, as much so as if incorporated into it.

(Davis v. Ramsford, 17 Mass., 207; The Proprietors of the Kennebec Purchase v. Tiffany, 1 Greenl., 220; Thomas v. Hatch, 3 Sum., 170; 2 Hilliard, 348.)

In his petition, Sutter refers to the fact that he had "established himself," with the approbation of the Governor, upon the land he then occupied, and to the flattering condition of "his establishment," and solicits, "in order to aggrandize his enterprise," eleven leagues, in the "establishment named New Helvetia," in accordance with the land designated in the accompanying plat.

The Governor, in his grant, refers to the petition, and concedes "the said land, (el terreno referido,) named New Helvetia." On examining the map, we find the place where the city of Sacramento now stands marked by the figure of a Fort, and designated as "Establa de Nueva Helvetia"—establishment of New Helvetia. It is difficult to resist the conclusion that the petition and grant both refer to the locality thus designated on the map; and this conclusion is strengthened, by finding, a few miles south, a line drawn across the map, marked "lindero," (boundary,) which was evidently intended to designate the southern boundary. This line is also marked "latitude north 38° 41' 32"." In the grant, the southern boundary given is the parallel of 38° 49' 32" north latitude, differing from the latitude marked on the map by the figure 9, in the number of minutes, instead of the figure 1, a mistake which might easily be made in drawing the grant. Of the two sets of figures, there is a difference in only one—a singular fact, if one was not made by attempting a copy of the other. It is not probable that the Governor, in drawing his grant, took any other designations of parallels of latitude than those he found on the map.* We have, then, as the southern boundary, the line marked "lindero;" the Sacramento River constitutes the western boundary; and the Three Peaks, and the parallel of 39° 41' 45" of north latitude the northern boundary. The difficulty remaining is with the eastern boundary, which is described in the grant as "the margins of Feather River." The language is peculiar. Feather River is not intended as the boundary, for it would be so designated; it is the margins of that river—land extending along the stream. The language was used to indicate the general limit and course of the eastern line. It does not necessarily mean that the eastern line must terminate with the length of the

* In the case of Charles Covillaud et al. v. The United States, before the Board of Land Commissioners, in which Covillaud et al. claimed under the grant to John A. Sutter, the deposition of Governor Juan B. Alvarado was taken. In his deposition, Alvarado states that, when he made the grant to Sutter, he compared it with the map which accompanied Sutter's petition; that Sutter was present, and gave him the points, and showed him the degrees of latitude; that he (Alvarado) did not precisely understand the latitude, but he *put the degrees of latitude in the grant as they were marked on the map.*

stream, and cease when the Feather River loses itself in the Sacramento.* So far as this boundary is inconsistent with the other calls of the grant and map, which are more definite and fixed, it must yield. The position of the line marked on the map, as the southern boundary, is too accurately determined, by reference to the American River and the Fort, and the establishment of New Helvetia and the *lagunas*, to be mistaken. These are fixed and permanent objects, which can not yield to the vague designation of "margins of Feather River." It matters not by what parallel of latitude that line is designated; whether by the true parallel, or by that of the Sandwich Islands; it is the position of the line, not its designation, which determines the boundary. But it is said that the parallel of latitude by which this line is designated falls near the junction of the Sacramento and Feather Rivers. If this be so, it would not follow that the line marked on the map must be given up; it would only require explanation, and parol evidence is admissible to explain why it was designated by a wrong parallel of latitude. Besides, if, taking the grant and map together, any portion of the description must be rejected, reference will be had to the circumstances under which the grant was made, and the intention of the parties, and parol evidence is admissible, in such case, for that purpose. That portion will be rejected, and that construction adopted, which will give effect to the intentions of the parties. If the line of true parallel of latitude, cutting the Rivers Sacramento and Feather at their junction, be adopted, the map must be entirely thrown aside, the cession of the establishment of New Helvetia abandoned, the words "margins" of Feather River rejected as surplusage, and the intentions of Sutter, as expressed in his petition, and of the Governor, as indicated by the language of the grant, be entirely disregarded. But, by adopting the line marked as "*lindero*," a few miles below Sacramento, as the true southern boundary—the map and grant are considered together—New Helvetia is retained, and the intentions of the grantor and grantee fully carried out. The evidence of Sutter and Vioget is admissible under the circumstances of this case. Their explanations remove nearly all the difficulties arising from inaccuracy of description. They identify the southern line as the one marked on the map; they show the cause of the error in the designation of the latitude, not only of the southern but of the northern line; the circumstances under which the land was petitioned for, and the grant made, and the intention of the parties; and they fix the location of New Helvetia.† That their evidence was admissible, and not subject to the objection urged by the defendants counsel, we will cite only a few authorities. In White *v.* Eagan, (1 Bay,

* See note C.                    † See note D.

Ferris *v.* Coover.

South Car. Rep., 247,) the land in question was described as bounded on Sir John Calleton on the *north*, and one Cox to the *south*, and parol evidence was admitted, to explain the situation of the land, contrary to the face of the deed, and to show that it was really bounded on Cox on the *north*, and on Sir John Calleton on the *south*. In Middleton *v.* Perry, (2 Bay, 539,) the land in the grant was described as situated on *Cedar Creek, waters of Broad River*. The defendant offered to prove a mistake made by the surveyor who originally surveyed the land, in saying the land lay on Cedar Creek, waters of Broad River, when, in fact, it lay upon *Cedar Creek, waters of the Catawba River*, and that there were two creeks by the name of Cedar Creek—one emptying into Broad River, and the other into the Catawba River; but the presiding Judge refused to allow testimony "to contradict the face of the grant, under the great seal," and the plaintiff had a verdict. The Court of Appeals, on a motion for a new trial, said : " They had no doubt but a new trial should be granted, on the ground that parol testimony should have been admitted, to have explained any mistake in the location of the land mentioned in the grant, under which defendant claimed, and that such explanation was not repugnant to the Statute of Frauds, as had been contended for by the plaintiff. That our Courts of Justice had frequently permitted witnesses to be sworn, in order to rectify any mistake in the location of land, or even to explain deeds, in cases of ambiguity or uncertainty, and the case of White and Eagan, quoted in the argument, was strong to that purpose."

In Clairmont *v.* Carlton, (2 New Hamp., 378,) it was held that "the identical monument or boundary referred to in a deed, is always a subject of parol evidence; and, when disputed, it is always left to the jury to say which was the actual monument intended."

In Steele's Heirs *v.* Taylor, (3 Marsh., 226,) it was held that a mistake in the calls of a patent may be corrected by reference to the plat and certificate of survey, which is evidence of the original position of the corners, and when they can be ascertained, they form the boundary, though variant from the description contained in the patent. In Alexander *v.* Lively, (5 Monroe, 160,) the patent and certificate of survey both called for eighty acres, included in a figure of five lines. The certificate agreed with the patent, but in examining them it was found that one call was opposed to another, and the defendant insisted that the patent was void, for uncertainty of description. The original plat of the survey differed from both patent and certificate, by representing a figure of six lines, and the plat was held proper evidence to show the position of the land. " We, therefore," say the Court, " conclude that the plat in this case must be held sufficient, under the circumstances, to supply the omitted

course, and to correct the silence or the omission of the certificate and patent, and that the Court below erred in refusing to supply the omitted line, and sustain the patent."

In Chapman *v.* Bennett, (2 Leigh, 357,) the lessor of the plaintiff brought ejectment for land lying in Wood county, under a patent from the Commonwealth of Virginia, issued in April, 1785, in which the land granted was designated as lying in the county of Monongalia. The defendant offered to prove, by the Act of the Assembly of June, 1784, for dividing the County of Monongalia, and establishing the County of Wood, and other evidence, that at the date of the patent no part of the present county of Wood lay within the boundaries of the county of Monongalia. But the Court allowed the grant to be read in evidence, holding that it was competent for the plaintiff to prove that the land in Wood county was the same land granted by the patent, notwithstanding the error of the patent as to the county it lay in.

In Page *v.* Scheibel, (11 Mo., 187,) the concession described the land in question as in Grand Prairie, and bounded by Little River. Proof was admitted to fix the location of the land, and it appeared that Grand Prairie did not, in fact, touch Little River, and it was held that the boundary of Little River must be rejected. The Court say : " The concession thus referred to described the lot, also, as in the Grand Prairie common fields, and also states that it lies between the Widow Mareschal and Little River. Nothing is known, or no information is given on the record, as to the existence or residence of the Widow Mareschal, but the lot in controversy does not touch Little River. There is evidence to show that the Grand Prairie common fields did not, in 1768, touch any part of Little River. If this be so, it is clear that Little River, although a *material* boundary, should be rejected. *The concession and confirmation must not fail because there is an impossible call in the concession.*"

In McIver, Lessee, *v.* Walker, (9 Cranch, 173,) the patents called for land *lying on Crow Creek,* describing them by course and direction, and referring to a plot annexed. Neither the lines in the certificate of survey, or the patents, called for crossing Crow Creek, and, if run according to the course and direction given, would not include the creek or any part of it, or the land in possession of the defendant. But the plat annexed represented Crow Creek as passing *through the tract,* and the plaintiff requested the Court to instruct the jury that the lines ought to be run so as to include Crow Creek and the lands in the possession of the defendants. The instruction was refused, and the defendants had judgment. The refusal of the instruction was assigned as error, and the Supreme Court, Mr. Chief Justice Marshall delivering the opinion, held that the lines should be so run as to include both sides of the creek, and conform, as near as possible,

to the plat annexed to the patents; and the judgment was reversed.

In *Lunt v.* Holland, (14 Mass., 149,) the plaintiff derived his title from a grant of the Commonwealth of Massachusetts, in which the premises conveyed are described as a certain tract of land, lying in township number one, in the county of *Cumberland*, which was surveyed and laid out in April, 1789, by *Samuel Titcomb*, and is bounded as follows, viz.: "Beginning at a hemlock tree standing by the south side of *River Androscoggin;* thence south, etc., to another hemlock tree, also standing by said river; thence south-eastwardly, and bounding by said river to the first-mentioned bound; said tract containing 4880 acres, more or less."

The land in controversy was an island containing about thirty acres, the river running on each side of it.   In addition to the grant, the plaintiff introduced the deposition of the surveyor, Titcomb, with a copy of the survey referred to, by which it appeared that he intended to include the island in question, and that he returned his survey to the agents of the State previous to the issuing of the grant.   The survey was introduced in evidence, under the objection of the plaintiff, who contended that the tract of land granted must be limited by the boundaries in the grant, which, being definite and fixed by monuments, could not be extended by reference to the survey, and that by them the island was necessarily excluded.

The Judge instructed the jury that, as there was direct reference in the deed to the survey, the island should be considered as within the description of the land in the deed, and the plaintiff had a verdict subject to the opinion of the whole Court, on the instruction of the Judge, and the admission of the deed, deposition, and survey.   On the motion for judgment, the counsel for the defendants contended that the land was described in the grant, and bounded by visible and known monuments, and by these the island in question was excluded; that there was no ambiguity in the language, and no construction *ab extra* should be admitted; that "bounding by the river" must intend that edge of the river on which the hemlock trees stood, or those trees could not be any part of the boundary; that, at the furthest, the land granted should be held to extend only to the thread of that branch of the river on which the trees were standing; but the Court, in giving its decision, said:

"The Commonwealth, in its deed to the plaintiff, having referred to Titcomb's survey, must be bound by it.   The grantee must take in conformity to that survey, and the island being included within the land surveyed, must pass by the deed;" and judgment was entered on the verdict.

In *Conn. v.* Penn., (1 Peters Circuit Court Rep., 511,) Mr. Justice Washington says: "No gentleman of the profession, who is

at all conversant with land-titles, can be ignorant that the courses and distances laid down in a survey, especially if it be ancient, are never in practice considered as conclusive; but, on the contrary, they are liable to be materially changed by oral proof, or other evidence tending to prove that the documentary lines are not those actually run. How often have we known reputed boundaries, proved by the testimony of aged witnesses, and even by hearsay evidence, established in opposition to the precise calls of an ancient patent? Such evidence has been constantly received, and distances have been shortened or lengthened without the slightest regard to the patent. The reason is obvious: it is not the lines reported, but the lines actually run by the surveyor which vests in the patentee the area included within those lines. The survey-returns, or the patent, is the evidence of the former; natural objects or reputation is, in almost all cases, the evidence in the latter. The mistakes committed by the surveyors or chain-carriers, more particularly in an unsettled country and wilderness, have been so common, and are so generally acknowledged, as to give rise to a principle of law as well settled as any which enters into the land-titles of this country, which is, that when the mistake is shown, by satisfactory proof, Courts of Law as well as Courts of Equity have looked beyond the patent to correct it."

The principle to be extracted from these cases is this: that the lines actually intended by the parties, if they can be ascertained, are to control. The rules adopted in the construction of boundaries, are those which will best enable the Courts to ascertain the intention of the parties. Thus, preference is given to monuments, because they are least liable to mistake, and the degree of importance given to natural or artificial monuments, courses, and distances, is just in proportion to the liability of parties to err in reference to them. But they do not occupy an inflexible position in regard to each other. To hold otherwise, would be to give greater importance to the rule itself than to the reason of the rule. It may sometimes happen, in case of a clear mistake, an inferior means of location will control a higher. In Davis v. Rainsford, (17 Mass.,) it was held that, if on taking the whole description together, it would be more reasonable to suppose a mistake was made in the monuments referred to than in the measurement of the distance, where the two disagree, the measurement should govern instead of the monuments; and in that case a diagram or plot of the land was allowed to control the designation of the monuments. " To this admeasurement," says the Court, " we are bound to adhere in order to effectuate the intention of the contending parties."

In Norwood v. Byrd, (1 Richardson, 135,) it was held that, when on the face of a deed the intention to convey a particular tract of land is clear, but the description of metes and bounds is

upon a survey for the purpose of locating the tract ascertained to be erroneous, the description by metes and bounds will be rejected as surplusage, and the land located so as to cover the tract clearly *intended to be conveyed.*

In Falwood *v.* Graham, (Ib., 497,) the Court say : " The defendant's counsel is wrong in supposing that there is any difference in the rules of location, as laid down and enforced in the older or more recent cases.    They all maintain that, in locating lands, we are to resort : *first,* to natural boundaries; *second,* to artificial marks; *third,* to adjacent boundaries; *fourth,* to courses and distances; but it has never been said that each of these occupied an inflexible position.    It sometimes might occur that an inferior means of location might control a higher, when it was plain there was a mistake.    As, where a tract of land is represented as lying on one great stream, and the artificial marks or other circumstances show that it lies upon another."

Now, apply this principle to the construction of Sutter's grant, and the difficulty which seems so insuperable to defendants' counsel of including New Helvetia in the face of the boundaries specified, disappears.    Besides, it may be well doubted whether Sutter's establishment, at the period when the grant was issued, was not a more conspicuous object of attention, and better known, than the position of the mountains, or the course of the rivers designated.    " In the construction of a grant," says Hilliard, " the Court will take into view the attendant circumstances, the situation of the parties, the state of the country, and of the thing granted.    So, if the terms of a deed are doubtful as to the boundaries."

In 1841, all Northern California was an unexplored region, its geography little known, and it was occupied almost exclusively by tribes of roving Indians.    Sutter was the first white man who made a settlement in the Valley of the Sacramento.    To give to mountains and streams, whose relative position to each other was imperfectly understood, the importance in determining the location of the grant as would be given if the grant were issued at this period, would be to adopt a rule of construction subversive of the plainest principles of justice.

And on this subject, and the construction of grants in California, the observations of Mr. Justice Grier, of the Supreme Court, in the case of the United States *v.* Sutherland, (19 Howard, 364,) are eminently just and pertinent : " In construing grants of land in California," says the Justice, " made under the Spanish or Mexican authorities, we must take into view the state of the country, and the policy of the government.    The population of California, before its transfer to the United States, was very sparse, consisting chiefly of a few military posts and some inconsiderable villages.    The millions of acres of land around them, with the exception of a mission or a rancho on some favored

spot, were uninhabited and uncultivated. It was the interest and the policy of the King of Spain, and, afterwards, of the Mexican government, to make liberal grants of these lands to those who would engage to colonize or settle upon them. Where land is plenty and labor scarce, pasturage and raising of cattle promised the greatest reward with the least labor. Hence, persons who established ranchos required, and readily received, grants of large tracts of country as a range for pasturage for their numerous herds. Under such circumstances, land was not estimated by acres or arpens. A square league, or "sitio de ganado mayor," appears to have been the only unit in estimating the superficies of land. Eleven of these leagues was the usual extent for a rancho grant. If more or less was intended in the grant, it was carefully stated. Surveying instruments or surveyors were seldom to be obtained in distant locations. The applicant for land usually accompanied his petition with a *deseño*, or map, showing the natural boundaries or monuments of the tract desired. These were usually rivers, creeks, rivulets, hills, and mountain ranges. The distances between these monuments were often estimated at *about* so many leagues, and fractions of this unit but little regarded. To those who deal out land by the acre, such monuments as hills, mountains, etc., though fixed, would appear rather as vague and uncertain boundary-lines. But where land had no value, and the unit of measurement was a league, such monuments were considered to be sufficiently certain. Since this country has become a part of the United States, these extensive rancho grants, which then had little value, have now become very large and very valuable estates. They have been denounced as enormous monopolies, princedoms, etc.; and this Court has been urged to deny to the grantees what, it is assumed, the former governments have too liberally and lavishly granted. This rhetoric might have a just influence, when urged to those who have a right to give or refuse. But the United States have bound themselves by a treaty to acknowledge and protect all *bona fide* titles granted by the previous government; and this Court have no discretion to enlarge or curtail such grants, to suit our own sense of property; or defeat just claims, however extensive, by stringent technical rules of construction, to which they were not originally subjected."

Having disposed of the two principal questions raised by the record, we proceed to consider the other errors assigned by the appellants to the ruling of the Court below, viz.: *first*, in its instruction to the jury; *second*, in its refusal to admit evidence of abandonment of the premises by the plaintiff or his grantor; *third*, in its refusal to give the first instruction asked by the defendants; and, *fourth*, in its rejection of the tax-deed. The instruction given by the Court is as follows: "If you believe, from the evidence, that the lots in controversy are embraced within the

*boundaries of the map* introduced before you in this case, and that the map is a correct copy of the original map delivered to John A. Sutter at the time he got his grant from the Mexican government, the plaintiff is entitled to recover. You must take the grant and map together; and if you believe the land in this suit *is within the grant, as explained by the map,* you will find for plaintiff."

The last clause qualifies the language of the preceding clause, which would otherwise have been liable to the objection urged by the defendants. Both clauses being taken together, the instruction is, that the land must be within the grant as explained by the map, and not merely within the boundaries of the map.

The plaintiff having proved title in his grantor, and afterwards in himself, there could be no abandonment by either, and the Court properly excluded all evidence on the point. The doctrine of abandonment only applies where there has been a mere naked possession without title. The right of the occupant originating in mere possession, may, as a matter of course, be lost by abandonment. Where there is title, to preserve it there need be no continuance of possession, and the abandonment of the latter can not affect the rights held by virtue of the former.

The first instruction to the jury asked by the defendants, and refused, was as follows : " If you find that plaintiff, or his grantors, or some of them, stood by and saw defendants making valuable improvements, and did not interfere, nor give any notice of an adverse claim to the lots, then you are entitled to find for the defendants."

The principle contended for by this instruction is, that silence on the part of the owner of premises as to his title may be urged by a trespasser, who is erecting valuable improvements upon them, as an estoppel against the assertion of the legal right of such owner. This would be extending the doctrine of equitable estoppel beyond all the precedents. That doctrine is based upon very different principles, and applies to very different cases, from the one at bar. It arises where one is directly influenced to his own injury, by the acts, declarations, or silence of another, in relation to the title of property, and is applied to protect against fraud on the one hand, and injury on the other. Silence becomes fraudulent only when the facts respecting the title are in the possession of one, and not of the other, and can not be easily ascertained, and they are concealed with a view of misleading—not where the facts are notorious, or can be easily ascertained, as by reference to the recorder's office. There is no reported case which we can find where silence could be urged as an estoppel by one acquainted with his own rights, or who had the means of ascertaining them. (Alexander *v.* Kerr, 2 Rawle, 90 ; Crest *v.* Jack, 3 Watts, 239 ; Carr *v.* Wallace, 7 Watts, 400 ; Robinson *v.* Jastin, 2 Penn., 22.)

If a party, with the knowledge of, or having the means of ascertaining, the title to real property, proceeds to occupy such property and expend his money in improvements, he is not entitled to any relief in law or equity. He has no right to complain, because he has not been misled by any one, and if mistaken, it has been his own fault. The title to real property carries with it all the improvements. The owner has a right to the exclusive use of his property without molestation from any one. Whoever interferes with its use and enjoyment by him, is a trespasser, and the interference is none the less a trespass because followed by the erection of structures which are termed improvements. The instruction would permit one man to strip another of his estate under the pretext of having improved it, unless notified of the title, although that title was notorious, or could be easily ascertained.

The defendant, Krause, offered in evidence a tax-deed of a portion of one of the lots in suit, which was rejected by the Court. It was executed to one Madden, by the sheriff, upon a sale for taxes for the year 1853, but is not under seal. The deed contains, in its recitals, an extract from the assessment-book, from which it appears that the property was not assessed either to the owner, occupant, or unknown owners; nor is its valuation stated, nor the amount of the State or county tax.

By the doctrine of the common law, the party claiming under a tax-deed must show that all the requirements of the law, from the first to the last, have been complied with. The officers of the government, from the assessment of the tax to the execution of the deed, are acting under a special power conferred by the law, and, as in every case of the exercise of a special power, they must keep clearly within the limits of their authority, or there will be no validity to their acts. That rule of the common law has been changed, by statute, in this State. Here, the deed itself is *prima facie* evidence of the conveyance of all the right, title, and interest, owned by the delinquent at the time of sale. The effect of this is to give to the deed itself the presumption that all the requirements of the law have been complied with, by which the title could vest, and to shift the burden of proof from the party who claims under the deed to the party who attacks it. The clause of the statute does not, however, dispense with the necessity of the officer reciting in the deed the authority under which he executes it. It has no validity, as an independent conveyance. Its effect in the transfer of property arises from the power conferred by the statute, and a strict compliance with its conditions; and the deed must bear on its face a reference to that power. If, in reciting the authority for the sale upon which the deed is given, it appears that some material requisition of the law has been omitted, the deed is void. In the present case, the recitals show that the property was not

listed and valued by the assessor.   This is fatal to the deed. The listing and valuation of real estate for the purpose of taxation, is an essential pre-requisite to the validity of all subsequent proceedings.   It is from the list made by the assessor, after it has been corrected by the board of equalization, that the auditor prepares the duplicate, which gives to the officer his authority to demand the tax, and to levy and sell the property of the delinquent.

If no valuation was placed by the assessor upon the property, none could be placed upon it by the board of equalization.   The board may alter the valuation in order to equalize it, but can not place the valuation in the first instance.   That is the duty of the assessor.   In consequence of the neglect of the assessor, the duplicate would reach the officer without any valuation placed upon the property, and of course no authority would exist in him to levy upon and sell the property.   We do not notice the want of a seal to the deed, because its absence has not been alluded to by counsel, and it is probably an omission of the copyist.

Judgment affirmed.

On an application for an extension of time to file a petition for a re-hearing, FIELD, J., delivered the opinion of the Court— BALDWIN, J., concurring.

This is an application for an extension of the time to file a petition for a re-hearing.   The application is based upon the affidavit of Mr. Weeks, that he has just been retained as counsel in the cases, and is unable to present the petition within the time prescribed by the rules of the Court.   There is nothing in the reason assigned which entitles the defendants to any extension.   These cases were submitted more than a year since, and elaborate written arguments were subsequently filed by the original counsel of the respective parties.   They have been the subject of long and mature consideration by the Court.   The questions involved in them are not new ; they have been the subject of discussion with the profession for the last seven years ; they have attracted the attention of the ablest jurists of the State, and been placed before the Court, in every possible view, and it would be no disparagement to the learning and ability of the counsel to say that we think it highly improbable that he could throw sufficient new light upon the questions to induce us to change our deliberate judgment.

The counsel of the plaintiffs, and one of the counsel of the defendants, have repeatedly called the attention of the Court to the cases, and invoked a decision.   The cases were placed on the calendar for the present term, like all other cases previously submitted, to be argued only in the event they were not decided before they were reached, and, like a great number similarly situ-

Ferris v. Coover.

ated, they were so decided.   No oral arguments could have been more elaborate or perfect than the written arguments on file.

Application denied.

## [NOTE A.]

### TRANSLATION OF THE DECREE OF THE MEXICAN CONGRESS, OF AUGUST 18TH, 1824, RESPECTING COLONIZATION.

[The Translation is taken from White's New Recopilacion, Vol. I, p. 601.]

*The Supreme Executive Power, provisionally appointed by the General Sovereign Constituent Congress, to all who shall see and understand these presents : Know ye, that the said Congress has decreed as follows :*

ARTICLE 1.   The Mexican nation offers to foreigners, who come to establish themselves within its territory, security for their persons and property; *provided,* they subject themselves to the laws of the country.

ART. 2.   This law comprehends those lands of the nation, not the property of individuals, corporations, or towns, which can be colonized.

ART. 3.   For this purpose, the Legislatures of all the States will, as soon as possible, form colonization laws, or regulations, for their respective States, conforming themselves, in all things, to the constitutional act, general constitution, and the regulations established in this law.

ART. 4.   There can not be colonized any lands comprehended within twenty leagues of the limits of any foreign nation, nor within ten leagues of the coasts, without the previous approbation of the General Supreme Executive power.

ART. 5.   If, for the defence and security of the nation, the Federal Government should deem it necessary to use any portion of these lands, for the construction of warehouses, arsenals, or other public edifices, they can do so, with the approbation of the General Congress, or, in its recess, of the Council of Government.

ART. 6.   Until after four years from the publication of this law, there shall not be imposed any tax whatever, on the entrance of foreigners, who come to establish themselves for the first time in the nation.

ART. 7.   Until after the year 1840, the General Congress shall not prohibit the entrance of any foreigner, as a colonist, unless imperious circumstances should require it, with respect to the individuals of a particular nation.

ART. 8.   The Government, without prejudicing the objects of this law, shall take such precautionary measures as it may deem expedient, for the security of the Confederation, as respects the foreigners who come to colonize.

ART. 9.   A preference shall be given, in the distribution of lands, to Mexican citizens, and no other distinction shall be made in regard to them, except that which is founded on individual merit, or services rendered the country, or, under equal circumstances, a residence in the place where the lands to be distributed are situated.

ART. 10.   The military who, in virtue of the offer made on the 27th March, 1821, have a right to lands, shall be attended to by the States, in conformity with the diplomas which are issued to that effect, by the Supreme Executive Power.

ART. 11.   If, in virtue of the decree alluded to in the last Article, and taking into view the probabilites of life, the Supreme Executive Power should deem it expedient to alienate any portion of land, in favor of any officer, whether civil or military, of the Federation, it can do so from the vacant lands of the Territories.

ART. 12.   It shall not be permitted to unite, in the same hands, with the right of property, more than one league square of land, suitable for irrigation, four square leagues in superficies, of arable land, without the facilities of irrigation, and six square leagues in superficies, of grazing land.