Filed 1/4/24  Ostrander v. Callahan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| DANIEL OSTRANDER, Individually and as Trustee, etc., et al., | C090957 |
| Plaintiffs, Cross-defendants and Appellants, | (Super. Ct. No. 18CV00566) |
| v. | |
| DANIEL JOSEPH CALLAHAN, Individually and as Trustee, etc., et al., | |
| Defendants, Cross-complainants and Appellants. | |

This case involves a boundary dispute between two neighbors.  Daniel and Dawn Ostrander own property next to Daniel and Rhonda Callahan.  The Ostranders claim that two small outbuildings built by the Callahans' predecessor and improved by the Callahans encroach on their property.  The Callahans, in contrast, claim the outbuildings are located entirely on their property.  Both sides retained surveyors to support their respective claims.  Following a bench trial, the trial court found the Callahans' surveyor

1

was more credible, and his survey thus established the location of the boundary line between the two properties. The Ostranders appeal,[1] arguing the Callahans' surveyor failed to follow two rules for interpreting property descriptions in deeds, and his survey is thus insufficient as a matter of law and cannot constitute substantial evidence of the location of the boundary line. We disagree, and thus affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The Ostranders and the Callahans own neighboring properties in a rural part of Chico, California. The Ostrander property is approximately eight acres, and the Callahan property is approximately two acres. The two properties share a boundary line on the south side of the Ostrander property and the north side of the Callahan property. The location of that boundary line lies at the heart of this case.

The Ostranders purchased their property in 1973, and the Callahans purchased their property in October 2016. When the Callahans purchased the property, there were two small buildings — which the parties refer to as the studio and the storage shed — located near the disputed boundary line. The studio and the storage shed have been on the Callahan property since 1982 and 1993, respectively. Both buildings were marketed as being part of the property the Callahans purchased. The seller had obtained a permit to improve the studio, and after purchasing the property, the Callahans spent over $60,000 to complete the improvements. They also made minor improvements to the storage shed. The trial court found the Callahans and their predecessor believed the studio and the storage shed were wholly on the Callahan property, and the Ostranders do not challenge this finding.

In late 2017, the Ostranders advised the Callahans that the studio and the storage

---

[1] The Callahans filed what they call a "prophylactic" notice of appeal in the event we reversed the trial court's ruling. Because we do not reverse the trial court's ruling, we do not address the Callahans' appeal.

2

shed encroached on their property and had to be removed.  The parties ultimately filed competing quiet title lawsuits that sought to establish the boundary line between the two properties.[2]  The Callahans also alleged in the alternative that, if the studio and the storage shed encroached on the Ostrander property, they had an equitable easement that allowed them to keep using the buildings.[3]

A bench trial was held.  Both sides retained experts to survey the property based on the legal descriptions in the relevant deeds.  The Ostranders retained Wesley Gilbert, and the Callahans retained Kenneth Skillman.  Gilbert and Skillman both testified at trial, and their competing surveys were admitted into evidence (we note we have been provided with a copy of Skillman's survey, but not Gilbert's survey).  The trial court accepted both men as experts in surveying, and neither party seriously challenges that finding.

Gilbert's survey located the eastern point of the disputed boundary line approximately 13 feet south of (or below) where Skillman's survey located it, as shown on page No. 4 of Skillman's survey.[4]  According to Gilbert's survey, the boundary line runs through the studio and the storage shed, and the two buildings thus partially encroach on the Ostrander property.  According to Skillman's survey, the two buildings

---

[2]    The Ostranders and the Callahans asserted additional claims against each other that were resolved prior to trial and are not at issue here.  The only remaining claims at trial were for quiet title and declaratory relief.

[3]    The Callahans also claimed they had acquired title to the land on which the buildings sat through adverse possession.  Given the trial court's ruling (discussed below), it made no finding on the Callahans' adverse possession claim, and we thus do not discuss it.

[4]    Several pages of Skillman's survey depict both his boundary lines (by a solid line) and Gilbert's boundary lines (by a dashed line), and Gilbert testified the depiction is accurate.  As noted, we have not been provided with a copy of Gilbert's survey.  Skillman's survey is thus the only evidence we have of Gilbert's survey.

3

are wholly on the Callahan property. We discuss both surveys in more detail below. The trial court found Skillman was "a more credible" witness, that he "properly followed the calls in the relevant deeds and identified the relevant monuments necessary to determine the proper boundary lines," and that his survey thus established the location of the disputed boundary line. That means the two buildings are wholly on the Callahan property, and do not encroach on the Ostrander property.

Although ultimately not necessary to its decision, the trial court also found in the alternative that, even if it were to adopt Gilbert's survey, it would rule the Callahans were entitled to continued use of and access to the studio and the storage shed under an equitable easement theory, and the Ostranders would not be entitled to an injunction ordering the Callahans to remove the buildings.

The trial court entered judgment for the Callahans on their quiet title and declaratory relief claims, and declared the survey prepared by Skillman "shall be controlling as to the boundary line separating the Ostrander Property and the Callahan Property." It also entered judgment against the Ostranders on their quiet title and encroachment claims.

This appeal followed.

## DISCUSSION

The Ostranders make two arguments on appeal. First, they argue Skillman's survey is insufficient as a matter of law and the trial court thus erred in finding it established the location of the boundary line. Second, they argue the trial court erred in finding the Callahans were entitled to an equitable easement without also limiting the scope of the easement and awarding them damages. For the reasons explained below, we find the trial court did not err in finding Skillman's survey established the location of the boundary line and we affirm the judgment on that basis. We thus need not reach the Ostranders' second argument.

4

# I

## *Standard of Review*

The parties disagree on the standard of review. The Ostranders argue it is de novo because Skillman's survey was insufficient as a matter of law, and because interpreting a deed is like interpreting a contract, and "interpreting a contract is a matter of law subject to de novo review." (*Estate of Jones* (2022) 82 Cal.App.5th 948, 953; see also *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238 [" 'It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence' "]; *In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 688, fn. 33 [where no extrinsic evidence is admitted "we independently interpret the parties' agreement by applying the relevant principles of contract interpretation"].) Citing *Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, the Callahans argue the substantial evidence rule governs. *Bloxham* held: " 'The questions where the line run by a survey lies on the ground, and whether any particular tract is on one side or the other of that line, are questions of fact. [Citation.]' [Citation.] [¶] 'Surveyors and civil engineers, like other experts, may give testimony on questions involving matters of technical skill and experience with which they are peculiarly acquainted. [Citations.]' [Citation.] The weight and credence to be given an expert's testimony is a question for the trier of fact." (*Id.* at pp. 737-738.) Once the trial court decides questions of fact, its ruling is reviewed under the deferential substantial evidence standard. (*Id*. at p. 739.)

We need not decide who is right. Regardless of which standard of review applies, we start with the presumption that the trial court judgment is correct "and the burden is on [the] appellant to demonstrate . . . that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) Even if we apply the de novo standard, the Ostranders fail to convince us Skillman's survey was insufficient as a matter of law.

II

*The Deeds and the Competing Surveys*

The Ostrander deed and the Callahan deed contain legal descriptions of the respective properties that are dependent on, or derivative of, each other.  The Ostrander deed's description begins as follows:  "*COMMENCING at the section corner common to sections 7, 8, 17, 18 of said Township 22 North, Range 3 East,* marked by a fence post in a rock mound and witnessed by the remains of three Oak trees at correct distance and bearing of the original government field notes, *and running thence South 365.25 feet to a point in the centerline of the Humbug Road marking the <u>true point of beginning</u> for this description*."  (Italics and underlining added.)  From this "true point of beginning," the deed then describes a line running to another point, and then to another point, and so on, until the last line returns to the point of beginning.  The lines described in the deed are the boundary lines of the property.  The property described in the Ostrander deed is not a simple square or rectangle; instead, it is an irregular shape with nine sides.[5]  After

---

**5**      Here is the complete legal description:  "COMMENCING at the section corner common to sections 7, 8, 17, 18 of said Township 22 North, Range 3 East, marked by a fence post in a rock mound and witnessed by the remains of three Oak trees at correct distance and bearing of the original government field notes, and running thence South 365.25 feet to a point in the centerline of the Humbug Road marking the true point of beginning for this description; thence along said centerline of the Humbug Road 6˚ 10' East 234.50 feet; thence North 41˚ 38' East 173.0 feet more or less to the North line of said section 17; thence Easterly along the said North Line of Section 17, a distance of 612 feet to the centerline of Butte Creek; thence meandering down the centerline of Butte Creek the follow 4 courses and distances:  South 8˚ 15' West 120 feet; South 25˚ 20' West 332.0 feet; South 5˚ 00' West 107.0 feet; South 10˚ 13' West 109.7 feet to the Northwest corner of the parcel of land described in the Deed from Charles D. Eldred et ux to Avis Navarra recorded May 21, 1963, in book 1234, of Official Records, at page 143; thence along the Northerly line of said Navarra parcel North 72˚ 40' 30" West 18.74 feet to an iron pipe on the Westerly bank of said Butte Creek; thence continuing North 72˚ 40' 30" West 609.26 feet to the center of said Humbug Road; thence along said road centerline North 24˚ 40' East 65.24 feet; thence North 6˚ 10' East 10.50 feet to the point of beginning."

describing this multi-sided parcel of property, the Ostrander deed then states, "EXCEPTING THEREFROM the Southwesterly 150.00 feet lying between parallel lines as measured at right angles to the South line of the above described parcel." The Ostrander property thus consists of the multi-sided parcel described in the deed, *except* "the Southwesterly 150.00 feet lying between parallel lines as measured at right angles to the South line" of that parcel. The Callahan deed, in turn, describes the Callahan property as "The Southwesterly 150.00 feet lying between parallel lines as measured at right angles to the South line of the following described parcel," and then goes on to repeat almost verbatim the legal description in the Ostrander's deed. The boundary line between the Ostrander property and the Callahan property is thus the line that is 150 feet from, and parallel to, the southern-most line of the larger multi-sided parcel described in both deeds.

The description of a line in a deed is often referred to as a *call*, as in *the first call of the deed*, etc. A line can be described by reference to (1) course (or direction or bearing)[6] and distance (for example, "North 6° 10' East 234.50 feet"), or (2) monuments, which are visible and fixed objects (for example, "to an iron pipe on the Westerly bank of Butte Creek"). The parties appear to agree that the difference between Skillman's survey and Gilbert's survey stems primarily from the first call — i.e., "COMMENCING at the section corner common to sections 7, 8, 17, 18 of said Township 22 North . . . and running thence South 365.25 feet to a point in the centerline of the Humbug Road marking the true point of beginning for this description." It also appears that Gilbert and Skillman both started at the same section corner but ended up at a slightly different point of beginning.

---

**6**    In surveying, the word "course" refers to "the direction of a line." (Black's Law Dictionary (6th ed., 1990) p. 351.) The word "bearing" is also used to refer to the direction of a line. (See *Richfield Oil Corp. v. Crawford* (1952) 39 Cal.2d 729, 740-742.)

Gilbert testified he found the point of beginning by going 365.25 feet "true south" from the section corner, or "zero degrees southwest, zero degrees southeast." He also testified he did not actually "synchronize" that point of beginning with the centerline of Humbug Road because "the center line of the road is an undefinite, indefinite description. It moves as times goes on." Finally, Gilbert testified that Skillman found the point of beginning by going slightly southeast, or, more precisely, by going one degree and 31 minutes southeast, from the section corner, and that, but for that one difference between their two surveys, "we wouldn't be sitting here having this discussion."

> "Q:   As we sit here today, do you think that the difference
>        between your survey and Mr. Skillman's survey is that
>        you went south and he did not?
>
> "A:   That's correct."

Skillman agrees with Gilbert that this is what accounts for the discrepancy between the two surveys, testifying, "the angular error of the degree and the 31 minutes and that rotational error is what's causing the discrepancy."

III

*Analysis*

Courts have developed numerous rules for construing deeds, many of which are codified in section 2077 of the Code of Civil Procedure. The purpose of these rules is to help courts to best "ascertain the intention of the parties." (*Ferris v. Coover* (1858) 10 Cal. 589, 628.) The Ostranders contend their surveyor (Gilbert) complied with the relevant rules, while the Callahans' surveyor (Skillman) did not. As a result, they contend Skillman's survey is contrary to law and thus cannot constitute substantial evidence to support the judgment. We are not convinced that Skillman failed to comply with the relevant rules, and thus are also not convinced that his survey is contrary to law and cannot constitute substantial evidence to support the judgment.

8

The Ostranders argue that Gilbert properly followed the first call of the deed to the point of beginning, while Skillman did not. Again, the first call is as follows: "COMMENCING at the section corner . . . and running thence South 365.25 feet to a point in the centerline of the Humbug Road marking the true point of beginning for this description." As noted above, it appears undisputed that Gilbert and Skillman started at the same section corner but ended up at a slightly different point of beginning because Gilbert went due south, while Skillman went slightly southeast. The Ostranders cite the rule that the word *south* (or *north*, etc.) when used alone and not qualified by other words means *due south* (or *due north*, etc.); but if qualified by other words, "it means precisely what the qualifying word makes it mean." (*Fratt v. Woodward* (1867) 32 Cal. 219, 228; see *id.* at pp. 227-228; see also *Currier v. Nelson* (1892) 96 Cal. 505, 508 ["The word 'north,' unless qualified or controlled by other words, means due north"]; *E. E. McCalla Co. v. Sleeper* (1930) 105 Cal.App. 562, 569 ["When the terms 'east' and 'west' are used in the description of the courses of the boundary of land, without modification or variation, they must be deemed to mean *due* east and *due* west"].) Based on this rule, the Ostranders argue the point of beginning described in the deeds is a point exactly 365.25 feet due south from the section corner, whether or not that point is on the centerline of Humbug Road. In other words, they interpret the first call like this, with the italicized portion controlling over the underlined portion: "COMMENCING at the section corner . . . and *running thence [due] South 365.25 feet* to a point in the centerline of the Humbug Road." Indeed, the Ostranders essentially argue the underlined portion of the first call is irrelevant, because Gilbert testified he did not even try to synchronize the point of beginning with the centerline of Humbug Road because the centerline is "indefinite" and "moves as times goes on." They cite no authority for the proposition that it was proper for Gilbert to simply ignore this language in the deed, and we are aware of no such authority. Instead, the rule appears to be otherwise — namely, that a deed "is to be construed, if possible, so as to give *all* of its operative words effect." (*Walsh v. Abbott*

9

(1904) 145 Cal. 285, 289, italics added; see also *Firth v. Los Angeles Pacific Land Co.* (1915) 28 Cal.App.399, 403 [" 'The deed is so construed, if possible, as to give effect to all its provisions' "].)

The Callahans argue it was actually Gilbert who failed to follow the rule cited by the Ostranders. They argue the word "south" in the first call of the deed is qualified by the phrase "to a point in the centerline of the Humbug Road." As just noted, the word *south* only means *due south* when not qualified by other words, but if qualified by other words, "it means precisely what the qualifying word[s] make[] it mean." (*Fratt v. Woodward, supra*, 32 Cal. at p. 228.) The Callahans thus argue that Gilbert failed to follow the relevant rule because he ignored the qualification. We agree.

In their reply brief, the Ostranders acknowledge the words "to a point in the centerline of the Humbug Road" are qualifying words, but they argue those words qualify only the distance (i.e., "365.25 feet") and not the course (i.e., "South"). They cite no authority to support their argument, and we are thus free to disregard it. (See *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 [we may disregard arguments not supported by pertinent legal authority].) They also argue there would be "countless points along th[e] centerline" of Humbug Road that are 365.25 feet from the section corner, and that the only way to identify the point of beginning is by going due south for 365.25 feet, whether or not that 365.25-foot line ends up on the centerline of Humbug Road. According to the Ostranders, "This is conceptually similar to how numerous lines can be drawn from the center point of a circle, at different angles, to many various points along the circumference line." We find the analogy to the numerous radii of a circle is inapt because Humbug Road is a line (or a series of lines), not a circle, and there would be only one point on that line that would be more or less south 365.25 feet from the section corner.

Our conclusion that Gilbert failed to properly follow the first call of the deed is reinforced by a second rule for interpreting deeds, namely, that when a deed describes

property by reference both to monuments and to courses and distances, and where those descriptions conflict, " 'the description by monuments shall in general prevail.' " (*Colton v. Seavey* (1863) 22 Cal. 497, 502.)  Monuments are visible objects, either natural or manmade, and include things like rivers, mountains, marked trees, stakes, posts, and, as relevant here, *roads*.  (*Ibid*.; see also *Moss v. Shear* (1866) 30 Cal. 467, 480 [line in a deed "can be so run to the road as a fixed monument"]; *Belle Terre Ranch, Inc. v. Wilson* (2015) 232 Cal.App.4th 1468, 1472 ["The point of controversy was how best to locate the centerline of that road (which was a monument in the . . . deeds)"].)  Monuments prevail over conflicting courses and distances because " 'it is more likely that a person purchasing or selling land should make mistakes in respect to course, distance, and quantity, than in respect to visible objects, which latter, from being mentioned in the deed, are presumed to have been examined at the time.' " (*Colton*, at p. 502.)  As our Supreme Court stated over 150 years ago, "Nothing is more common than discrepancies between the monuments and the courses and distances set forth in deeds.  In such cases the monuments govern; and for the reason that they are usually stated upon full knowledge and reflection, while as to courses and distances they are most frequently arrived at by estimate or guess in all those cases where visible monuments are named." (*Franklin v. Dorland* (1865) 28 Cal. 175, 178-179; see also *Vance v. Fore* (1864) 24 Cal. 435, 446 ["the . . . reason why monuments are followed as against courses and distances is, that of the two, monumental lines are more stable and certain, and are less liable to be mistaken"]; *Devlin v. Powell* (1924) 67 Cal.App.165, 171 ["It is one of the cardinal rules of construction that where natural objects or monuments are referred to, courses, distances, lines and angles must give way, if there is any conflict or ambiguity and the natural objects or monuments will prevail"]; *Phelps v. Pacific Gas & Electric Co.* (1948) 84 Cal.App.2d 243, 248 ["It is a well-established rule of law that quantity is the least reliable of all descriptions, and course and distance must yield to calls for monuments, natural and artificial"].)

Based on this rule, the Callahans argue that, when interpreting the first call of the deed, the centerline of Humbug Road controls because a road is a monument, and monuments prevail over courses and distances. In other words, they interpret the first call like this, with the underlined portion controlling over the italicized portion: "COMMENCING at the section corner . . . and *running thence South[ish]* 365.25 feet <u>to a point in the centerline of the Humbug Road</u>." Again, we agree. (See *Meeker v. Simmons* (1909) 10 Cal.App. 250, 251, 256 [where deed specified boundary line " ' "running along the center of the county road, north 30 [degrees] 45' west 6.8 chains," ' " but going north 30 degrees 45' west 6.80 chains would actually carry the boundary line 50 feet east of the center of the county road, the boundary line is properly set along the center of the county road because monuments prevail over courses and distances].)

The trial court also agreed with the Callahans, finding as follows: "Mr. Gilbert's survey failed to consider the relevant monuments or calls in the deeds, including as to the location of Humbug Road as it related to the calls in the deed related thereto. [¶] Notably, the Court finds that Mr. Gilbert's survey failed to go 'South 365.25 feet to a point in the centerline of Humbug Road,' as Mr. Gilbert admitted neither he nor his crew located said road in the field. As Mr. Gilbert completely failed to follow this call, his survey cannot be considered credible. Mr. Gilbert's argument that he was instead supposed to base this line off of a 'due south' direction, while ignoring the call to Humbug Road, is not proper." For the reasons just discussed, the Ostranders fail to convince us that the trial court erred in so finding.

The Ostranders have one other, related, argument. They argue that Skillman ignored a third rule for interpreting deeds, which is that monuments that are not named or referenced in a deed cannot "fix the bounds of a tract of land otherwise perfectly well defined." (*Powers v. Jackson* (1875) 50 Cal. 429, 433 (*Powers*).) According to the Ostranders, Skillman improperly adjusted his survey results to take account of a physical

monument (referred to as a four-foot tall "concrete post" or "obelisk") that is not named or refenced in either the Ostrander or Callahan deeds.

The concrete post at issue is shown on page Nos. 2, 3, and 4 of Skillman's survey, and is identified by the letter "A" with a circle around it. The post is not located on or within the boundaries of either the Ostrander or the Callahan parcels. Instead, it is located on the southern boundary of a parcel that is to the south of, and two parcels away from, the Callahan parcel, as shown most clearly on page Nos. 2 and 4 of Skillman's survey. According to Skillman's testimony and survey, the concrete post is referenced in a "senior deed" recorded in 1960 that transferred a 13.55-acre parcel of land from Leo and Maxine Connell to Charles and Arah Eldred. The 13.55-acre parcel of land described in the senior deed was later subdivided into the Ostrander parcel, the Callahan parcel, and two other parcels to the south of the Callahan parcel. Gilbert agrees the senior deed "is the deed that actually creates what would later become subdivided into the Ostrander, Callahan and two other properties."

The concrete post is also shown on an "un-recorded map" by "Batham & Batham" of a survey for Leo Connell on file in the Butte County Public Works office. Skillman utilized this map (which he referred to as the "Batham map") when completing his survey, and it is referenced on his survey as "R2." Like Skillman, Gilbert also relied on the Batham map when completing his survey, and he testified the map caused him to change his "basis of bearings." Gilbert testified the Batham map "is what created the Callahan property." Although the Batham map was admitted into evidence at trial as exhibit No. 12, we have not been provided with a copy.

Based on our review of Skillman's testimony and survey, and absent any argument to the contrary from the Ostranders, it appears to us that: (1) the concrete post was used to define the southern-most boundary of the larger 13.55-acre parcel of land that was later subdivided into four smaller parcels, including the Ostrander and Callahan parcels; and (2) when Skillman performed his survey of the Ostrander and Callahan parcels, he

13

retraced the boundaries of the larger parcel out of which the Ostrander and Callahan parcels were created, because, by definition, some of those boundaries would be the same as the boundaries of the Ostrander and Callahan parcels. As Skillman put it, "you start with the senior deed and work your way in." So understood, it appears perfectly appropriate to us that Skillman considered a monument used to identify the boundaries of the larger parcel when completing his survey of two of the smaller parcels.

The Ostranders disagree. They argue it was improper "as a matter of law" for Skillman to consider the concrete post in any manner, and they support their argument by citing *Powers, supra*, 50 Cal. at page 433, for the proposition that monuments "not named or referred to in the deed" cannot fix the bounds of a tract of land. The actual decision in *Powers* is brief (less than one page). In order to understand the decision, we must consider the language of the relevant deeds and several maps that are published in the official reporter. Although the decision itself refers to the deeds and the maps, they are not actually part of the decision, but if we ignore the deeds and the maps, it is difficult to discern precisely how (or whether) *Powers* applies to the facts in this case. Here, in full, is the relevant language from *Powers*: "No stakes or monuments, other than those of the government survey, are named or referred to in the conveyance [at issue]. Stakes, by whomsoever placed, cannot therefore be used to control the courses or distances of the description in that conveyance. To permit this would be to permit the deed to be contradicted whenever the location of the stakes did not agree with the termini of the lines mentioned in the deed. The question here is not whether, in locating a tract of land, stakes or monuments, named or referred to in the deed, shall control courses and distances also mentioned in the deed. In such cases, the stakes or monuments will ordinarily be regarded as fixing the true points. [¶] Here we are called on to say that objects not named or referred to in the deed shall fix the bounds of a tract of land otherwise perfectly well defined. This we cannot do without violating correct rules of construction." (*Ibid*.)

14

*Powers* thus appears to stand for the unremarkable proposition that a monument not mentioned in a deed cannot "fix the bounds of a tract of land otherwise perfectly well defined." (*Powers, supra*, 50 Cal. at p. 433.) That is not what happened here. Skillman did not fix the disputed boundary line between the Ostrander and the Callahan properties by moving that line to hit a monument (i.e., the concrete post) not mentioned in the deeds. Instead, and as discussed above, Skillman used the concrete post to retrace the boundary lines of the larger tract from which the Ostrander and Callahan tracts were created, which informed his survey of the Ostrander and Callahan tracts and the location of the boundary line between them. The Ostranders fail to convince us this was impermissible as a matter of law.

## DISPOSITION

The judgment is affirmed. The Callahans shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/
_____
EARL, P. J.

We concur:


/s/
_____
HULL, J.


/s/
_____
MESIWALA, J.